LAW LIBRARY

***FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER***

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---oOo---

STATE OF HAWAIʻI,
Respondent/Plaintiff-Appellee

vs.

SHANE MARK,
Petitioner/Defendant-Appellant
(NO. 26784; CR. NO. 03-1-0495)

STATE OF HAWAIʻI,
Respondent/Plaintiff-Appellee

vs.

SHANE MARK,
Petitioner/Defendant-Appellant
(NO. 26785; CR. NO. 03-1-0496)

JEAN R. KIKUMOTO
CLERK, APPELLATE COURTS
STATE OF HAWAIʻI
2010 MAY 12 AM 11:47
FILED

NO. 26784

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CR. NOS. 03-1-0495 & 03-1-0496)

MAY 12, 2010

MOON, C.J., NAKAYAMA, ACOBA, AND DUFFY, JJ., AND
CIRCUIT JUDGE KIM IN PLACE OF RECKTENWALD, J., RECUSED

OPINION OF THE COURT BY ACOBA, J.

Petitioner/Defendant-Appellant Shane Mark (Petitioner)
applied for a writ of certiorari on August 27, 2009, to review
the judgment of the Intermediate Court of Appeals (ICA) filed on

May 29, 2009, pursuant to its May 8, 2009 published opinion (opinion)[1] affirming in its entirety the August 2, 2004 Judgment in Cr. No. 03-1-0495 (Mark I) filed by the first circuit court (the court)[2]; and affirming the court's August 2, 2004 Judgment in Cr. No. 03-1-0496 (Mark II) with regard to the merits of the convictions but vacating the extended term sentences, and remanding Mark II to the court. See State v. Mark, 120 Hawai'i 499, 210 P.3d 22 (App. 2009). We hold that (1) for Petitioner's convictions of attempted assault in the second degree, Hawai'i Revised Statutes (HRS) §§ 705-500 (1993) and 707-711 (1993) in Mark I, murder in the second degree, (HRS) § 707-701.5 (1993) and attempted assault in the first degree, HRS §§ 705-500 and 707-710 (1993) in Mark II, jury instruction No. 65 with regard to Mark I and Mark II relating to the defense of use of force in defense of others pursuant to HRS § 703-305 (1993) was erroneous, inasmuch as it improperly included elements relating to the defense of defense of self, HRS § 703-304 (1993 & Supp. 2003); however, (2) the error was harmless because there was no evidence in the record to support a finding that, under the circumstances as a person would reasonably believe them to be, Petitioner was justified in using force in defense of others; (3) although there was concurrent representation of Petitioner and a hostile witness

---

[1] The opinion was authored by then-Chief Judge Mark E. Recktenwald and joined by Associate Judges Craig H. Nakamura and Katherine G. Leonard.

[2] The Honorable Karen S.S. Ahn presided.

by the Office of the Public Defender (OPD or the OPD) in a matter unrelated to Petitioner's trial, the concurrent representation ended and OPD withdrew as the witness's counsel before an actual conflict arose and, thus, retrial is not necessary;

(4) Petitioner's argument that he was denied the right to a fair trial due to prejudicial publicity, jury taint, and prosecutorial misconduct is incorrect inasmuch the record contains no evidence to support such a conclusion; and (5) on remand the court may empanel a jury to consider whether Petitioner should be sentenced to an extended term either pursuant to the judicially amended version of the extended term sentencing statute or pursuant to Act 1 of the Second Special Session of the 2007 legislature. See 2007 Haw. Sess. L. (Second Special Session) Act 1 at 1.

I.

The following essential matters, some verbatim, are from the record and the submissions of the parties.

A.

In summary, with respect to Mark I, in January of 2003, Petitioner purchased a camera from Kimo and John Piko (Piko). Petitioner then sold the camera to his friend, Russell Kimura (Kimura), who, a few days later, called Petitioner to tell him that the camera did not work. After informing Kimo that the camera was broken, Kimo agreed to return the money in exchange for the camera. On February 1, 2003, Petitioner, along with his pregnant girlfriend Leslie Martin (Martin), drove to a meeting at

a parking lot in order to complete the exchange. Although Petitioner had planned on meeting Kimo at the meeting, Piko and Denny Paikai (Paikai) arrived instead. Eventually, Kimura and his girlfriend Carle Enosara arrived with the camera.

Conflicting testimony was adduced at trial as to what happened next. The witnesses agreed, however, that a disagreement ensued regarding a box that contained the camera, initially held by Petitioner, which eventually ended up in Piko's possession. Petitioner testified that at that point "he took out the gun, pointed it above Piko's head and fired off a round into the air." According to Petitioner, he "was standing by the car right next to [Martin]. She was sitting on the driver's side. Paikai was moving to the front of the car by the headlights." Petitioner "testified that he took the gun and reached over the car and fired a single shot into Paikai's leg. [Petitioner] said he meant to shoot the leg and did not aim for the head or body."

B.

In summary, with respect to Mark II, on March 4, 2003, Petitioner, accompanied by Martin, went to a Baskin Robbins ice cream store in Kapolei to meet his ex-girlfriend Melissa Sennett (Sennett) and their daughter Shansy (Daughter). At the time, Petitioner was wanted by police in connection with Mark I. Operating on a tip from Sennett, police officers Glenn Gaspar (Officer Gaspar) and Calvin Sung (Officer Sung), both dressed in plain clothes, entered Baskin Robbins and attempted to arrest

Petitioner. While carrying out the arrest, a struggle ensued, during which Petitioner fired three shots from his gun. Officer Gaspar died as a result of gunshot wounds from the struggle.

## C.

### 1.

On March 6, 2003, two indictments were filed against Petitioner. In the first indictment related to Mark I, Petitioner was charged with one count of attempted murder in the second degree of Piko (Count I), and one count of attempted murder in the second degree of Paikai (Count II), HRS §§ 705-500,[3] 707-701.5,[4] and 706-656 (1993 & Supp. 2003),[5] two counts of

---

[3] HRS § 705-500 states in relevant part:

    (1)   A person is guilty of an attempt to commit a crime if the person:
    . . . .
        (b) . Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.
    (2)   When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

[4] HRS § 707-701.5 provides as follows:

    (1)   Except as provided in section 707-701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.
    (2)   Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706-656.

[5] HRS § 706-656 involves the sentencing of persons "for first and second degree murder and attempted first and second degree murder" and, thus,
(continued...)

carrying, using or threatening to use a firearm in the commission of a separate felony, HRS §§ 134-6(a) (Supp. 2003)[6] and 134-6(e) (Supp. 2003)[7] (Counts III and IV), and one count of ownership or possession prohibited of any firearm or ammunition by a person convicted of certain crimes, HRS §§ 134-7(b) (Supp. 2003)[8] and 134-7(h) (Supp. 2003)[9] (Count V).

On November 7, 2003, Petitioner pled no contest to Count V in Mark I.

## 2.

In the second indictment related to Mark II, Petitioner was charged with the offense of murder in the first degree of Officer Gaspar, HRS §§ 707-701(1)(b) (1993 & Supp. 2003)[10] and

---

[5](...continued)
was not technically "violated" by Petitioner.

[6]     HRS § 134-6(a) provides that

> [i]t shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony, whether the firearm was loaded or not, and whether operable or not[.]

[7]     HRS § 134-6(e) provides in relevant part that "[a]ny person violating subsection (a) or (b) shall be guilty of a class A felony."

[8]     HRS § 134-7(b) states that "[n]o person who is under indictment for, . . . or has been convicted in this state or elsewhere of having committed a felony, or any crime of violence, or an illegal sale of any drug shall own, possess, or control any firearm or ammunition therefor."

[9]     HRS § 134-7(h) provides that "[a]ny person violating subsection (a) or (b) shall be guilty of a class C felony; provided that any felon violating subsection (b) shall be guilty of a class B felony."

[10]     HRS § 707-701(1)(b) states that "[a] person commits the offense of murder in the first degree if the person intentionally or knowingly causes the death of . . . [a] law enforcement officer, judge, or prosecutor arising out of the performance of official duties[.]"

706-656 (Count I), one count of attempted murder in the first degree of Officer Sung, HRS §§ 705-500 and 707-701(1)(a)[11] (Count II), one count of carrying, using, or threatening to use a firearm in the commission of a separate felony, HRS §§ 134-6(a) and 134-6(e) (Count III), one count of possession of any firearm by a person convicted of certain crimes, HRS §§ 134-7(b) and 134-7(h) (Count IV), one count of promoting a dangerous drug in the third degree, HRS § 712-1243 (1993 & Supp. 2003)[12] (Count V), and one count of unlawful use of drug paraphernalia, HRS § 329-43.5(a) (1993)[13] (Count VI).

On November 7, 2003, Petitioner pled no contest to Counts IV, V, and VI in Mark II.

D.

1.

Mark I and Mark II were consolidated "at [Petitioner's]

---

[11]    Pursuant to HRS § 707-701(1)(a), "[a] person commits the offense of murder in the first degree if the person intentionally or knowingly causes the death of . . . [m]ore than one person in the same or separate incident[.]"

[12]    HRS § 712-1243(1) provides in relevant part that "[a] person commits the offense of promoting a dangerous drug in the third degree if the person knowingly possesses any dangerous drug in any amount."

[13]    HRS § 329-43.5(a) states as follows:

> (a) It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter. Any person who violates this section is guilty of a class C felony and upon conviction may be imprisoned pursuant to section 706-660 and, if appropriate as provided in section 706-641, fined pursuant to section 706-640.

request, and they were tried [by] a jury in December 2003."
Mark, 120 Hawai'i at 507, 210 P.3d at 30. In regard to Mark I,
Petitioner testified that after he arrived in the parking lot, he
looked through the rear window of his car and saw Piko and Paikai
approaching. Petitioner "thought they was going to do something
to us" and he felt "[p]retty frightened . . . because their looks
was intimidating and they was pretty big, and it's just their
attitudes." At that point, Petitioner "grabbed the gun from the
back seat and [] put it in [his] waist" "for protection, safety,"
although Petitioner did not plan to use the gun. Petitioner said
he was worried about safety "[b]ecause [Martin] was in the car
and she was pregnant, and also my friend's girlfriend was right
there."

Petitioner testified that he was standing between the
cars while Piko and Paikai approached him from opposite
directions. According to Petitioner, Piko "whack[ed]
[Petitioner's] car pretty hard with his one hand" and then
"turned towards me and he told me we just going take the camera
away from you, what you going do?" Petitioner then "gave [Piko]
the camera and [] said, here, you can have it." According to
Petitioner, Piko then "smiled and he was about to put the camera
down on the trunk, and he turned towards me and he said that we
just going take everything from you." Petitioner took this to
mean that "we was being robbed[,]" and he felt "[p]retty scared"
because "[t]he guys was going trap me between the two cars and

beat me up." Petitioner stated that he was also afraid for Martin and his unborn child because "[s]he would see these guys beating me up, and she would come out and try and stop them." Petitioner then pulled out his gun intending to scare Piko and Paikai away. He "pointed it above [Piko's] head and [] shot a round," at which point Piko ran off.

After Petitioner lost sight of Piko, he turned to look for Paikai. Petitioner saw him "kneeling down, and he was coming around [Petitioner's] car towards [Petitioner]." Petitioner "[f]elt like . . . [Paikai] might have a weapon or something[,]" and he "was real scared[.]" Petitioner "reached over the car, and when [Paikai] was about to turn the corner by the headlights by the front fender, [Petitioner] shot him in the leg." Petitioner "mean[t] to shoot his leg" in order "to stop him."

As to Mark II, on direct examination, Petitioner testified that he went to Baskin Robbins with Martin in order to meet Daughter, Sennett, and Sennett's boyfriend,[14] later identified as John Kortz (Kortz). Petitioner had a gun in his possession that he was carrying . . . with [him] everywhere." Petitioner entered Baskin Robbins, and saw Daughter, Sennett, and Kortz. He went up to Daughter and patted her on the back. Petitioner stated that as he was standing behind Daughter, who was sitting on a chair, he "pulled out [a] necklace and was going

---

[14]     Petitioner initially referred to Sennett's boyfriend as "Scott," but later in his testimony referred to the same person as "John Kortz." "Scott" was John Kortz's middle name, as well as his nickname.

to put it around her neck." When asked if Petitioner was able to "get the necklace on her neck[,]" Petitioner replied "no," and stated that "[a]t that time, these two guys was trying to grab me."

According to Petitioner, he did not see the "two guys" before they tried to grab him, and that he heard them say, "Put your hands up, put your hands up." Once the men had grabbed Petitioner, he "responded" by "[t]r[ying] for get these guys off of me . . . [b]ecause I didn't know who they was." Petitioner stated that he "had a feeling that they was going to pull me out of the store" to "[t]ake me someplace and kill me." Petitioner testified that in response to the efforts of the two men to "move me towards my daughter and out the door[,]" he "backed up" and "took them as far away from my daughter as I could." Petitioner stated he was "[p]retty scared, because my daughter can get hurt." During the struggle, a third man came up behind Petitioner and grabbed him in a "bear hug." Petitioner then got his right hand free, and grabbed the gun "[t]o get these guys off of me." Petitioner said, "I turned to one side like this, and then I shot him one time." Petitioner then "shot two more times."

According to Petitioner, had he known that the men grabbing him were police, he "would have stopped and listened to every command they told me . . . [b]ecause I would know that my daughter them would be safe." Petitioner stated that he "first

learn[ed] that the people that had grabbed [him] were police officers . . . [a]s they were picking [him] up and dragging [him] out of the store."

Officer Sung testified that he and Officer Gaspar entered the store and "[one] hundred percent positively ID'd [Petitioner], and then we turned toward [Petitioner]" and lifted up their shirts to display their police badges.  Officer Sung stated that Petitioner was "about eight to ten feet away" at the time.  He stated that "then I see [Petitioner] reaching for something, and from my police training and experiences, usually when they reach for something in their pocket, usually it means weapon, so I'm telling [Petitioner] pull [sic] your hands up, police, and then I kept on approaching [Petitioner]."  Officer Sung testified that Petitioner "was reaching toward his right pants pocket[,]" "and that's the reason why I told him 'Put up your hands, police.'"

According to Officer Sung, "[Officer Gaspar] reache[d] over, he was using his -- both of his hands, he grabbed.  He's using his left hand to grab [Petitioner's] right wrist area, and he was using his right hand to grab his left hand area, and then I was trying to grab his elbow area to -- to restrain his right arm."  Officer Sung stated that he was grabbing for Petitioner's right hand in order to stop Petitioner from "[r]eaching for any kind of weapons, possibly gun or possibly knife, possibly harming other people."  Officer Sung went on to describe the struggle,

stating that Petitioner "was trying to break free of us, our restraint, and then he was reaching something into his pocket."

Petitioner was then able to get his hand free to grab the gun, and Officer Sung saw it pointed at both him and Officer Gaspar. As the struggle continued, Officer Sung "heard two gunshots going off, like right after the other." The group then fell to the ground, and, according to Officer Sung, Petitioner "tried to curl his arm, and then he was pointing the gun at me at the same time[.]" Officer Sung testified that Petitioner pointed the gun at him "at least two times." Officer Sung next heard a third detective say that he had taken Petitioner's gun, and then Officer Sung was able to handcuff Petitioner and place him under arrest.

At that trial, the court gave jury instructions regarding "the defense of another person," as well as self-defense, to Counts I-IV of Mark I and Counts I-III of Mark II. As pointed out by the ICA, "[t]he instructions were similar to each other, with some exceptions that are not relevant to this appeal."[15] Mark, 120 Hawai'i at 522, 210 P.3d at 45. In his Application, Petitioner takes issue with Jury Instruction No. 65, relating to a defense to the charge of murder in the first degree (Count I in Mark II), which stated in part as follows:

> [1] In Count [I] of [Mark II], if you unanimously find that the prosecution has proven beyond a reasonable doubt

---

[15]     Petitioner did not disagree with this conclusion.

all of the material elements of Murder in the First Degree, or of the included offense of Murder in the Second Degree, or of the included offense of Manslaughter based upon reckless conduct, then you must consider whether the force used by Defendant was justifiable based upon use of force in defense of another person.

[2] Justifiable use of force or deadly force in defense of another person is a defense to the offenses of Murder in the First Degree, Murder in the Second Degree, and Manslaughter based upon reckless conduct. The burden is on the prosecution to prove beyond a reasonable doubt that the force used by the Defendant was not justifiable based upon use of force in defense of another person. If you unanimously find that the prosecution has not met its burden, then you must find the Defendant not guilty as to Count [I] of [Mark II]. If you are not unanimous as to whether the prosecution has met its burden, then a verdict cannot be returned as to Count [I] of [Mark II].

[3] The use of force upon or toward another person is justified to protect a third person when:

1. Under the circumstances as the Defendant reasonably believed them to be, the third person would have been justified in using such force to protect himself or herself; and

2. The Defendant reasonably believed that his intervention was immediately necessary to protect the third person.

[4] The reasonableness of the Defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the Defendant's position under the circumstances of which the Defendant was aware or as the Defendant reasonably believed them to be.

[5] The third person would have been justified in using force upon or toward [Officer Gaspar] if he or she reasonably believed that such force was immediately necessary to protect himself or herself on the present occasion against the use of unlawful force by [Officer Gaspar].

[6] The third person would have been justified in using deadly force upon or toward [Officer Gaspar] if he or she reasonably believed that deadly force was immediately necessary to protect himself or herself on the present occasion against death, serious bodily injury, or kidnapping.

[7] The use of deadly force is not justifiable [(a)] if the Defendant, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter, or [(b)] if the Defendant knows that he can avoid the necessity of using such force with complete safety by retreating. . . .

. . . .

(Emphases added.) Petitioner did not object to Jury Instruction No. 65.

2.

On December 22, 2003, in regard to Mark I, the jury returned the following verdict: Count I, no verdict on the charge of attempted murder in the second degree of Piko; Count II, Petitioner guilty of the included offense of attempted assault in the second degree of Paikai; Count III, no verdict on the first of two charges of carrying, using or threatening to use a firearm in the commission of a separate felony, Count IV, Petitioner guilty on the second charge of carrying, using, or threatening to use a firearm in the commission of a separate felony. Also on December 22, the jury returned the following verdict in regard to Mark II: Count I, Petitioner guilty of murder in the second degree of Officer Gaspar; Count II, no verdict on the charge of attempted murder in the first degree of Officer Sung; Count III, Petitioner guilty of carrying, using or threatening to use a firearm in the commission of a separate felony.

As to Counts I and III in Mark I and Count II in Mark II, the court found "manifest necessity" and "set these cases for retrial[.]" As to the four counts of which Petitioner was found guilty, the court left "the sentencing date until after the retrial[.]"

On March 31, 2004, Respondent/Plaintiff-Appellee State of Hawai'i (Respondent or the prosecution) filed motions for extended terms of imprisonment in Mark I and Mark II.

14

E.

1.

On July 7, 2004, Petitioner's second trial began as to Counts I and III in Mark I and Count II in Mark II. On July 14, 2004, during the second trial, at a conference with the court out of the presence of the jury, Deputy Public Defender (DPD) Debra Loy (Loy), who was representing Petitioner, engaged in the following colloquy regarding the prosecution's plan to put Piko on the stand:

> [LOY]: Your Honor, we have also been informed that [] Piko is in custody; and rather than have a question about prior bad acts, we need to find out what that is. I have not been able to find him in the records of the state custody people. And, so, I need an offer of proof what he's serving time for.
> THE COURT: How long have you known that [] Piko was in custody?
> [LOY]: This morning I had it confirmed. I thought [] Paikai was in custody, and he denied it, and he told me Piko was.
> THE COURT: Is [] Piko in custody?
> [PROSECUTOR]: Well, Judge, I find it impossible to believe that they don't know that he's in custody since their office represented him in the last six months, in this building, Jason Burks [(Burks)], Deputy Public Defender, which I think raises serious ethical problems in that office. But they did it; they know it.
> [LOY]: And you knew it all this time?
> [PROSECUTOR]: No, no.
> [LOY]: We haven't known it.

(Emphases added.) Loy argued that "[i]f [Piko is] on probation and we're still representing him, we have a mistrial problem, and we cannot cross-examine him." However, the prosecutor argued that "[t]hey can cross-examine him on anything[.]"

The discussion continued at length, with Loy explaining that she felt there was an "ethical problem" related to representing Petitioner and Piko at the same time, and the

prosecutor arguing that no such problem existed. Loy argued that "[t]he issue is related to [Petitioner's] right to have representation, full and fair representation by a person who has no loyalty to anyone else, Judge." The colloquy then resumed:

> THE COURT: . . . I do not know, I will not know until I look at the case law on this duty to defend and duty of loyalty and whether in a big office like the Public Defender's Office that [sic] can be divided.
> [LOY]: Well, [] Burks works in the same section I do. We probably share the same secretary. I have to confirm that.
> THE COURT: Are you asking for a mistrial?
> [LOY]: I'm asking for a mistrial.
> THE COURT: Okay. We'll take it under advisement. We're going to have to excuse the jury, though.
> [PROSECUTOR]: And we're objecting, Your Honor.

(Emphases added.)

On July 20, 2004, Petitioner filed a Motion for Mistrial and Motion to Withdraw as Counsel and to Appoint Other Counsel (Petitioner's Motion). Attached to Petitioner's Motion was a "Declaration of Counsel," in which Loy explained that (1) in November and December of 2003, she and [DPD] Teresa Marshall (Marshall) represented Petitioner during his first trial, (2) "[a]t that time, neither [Loy] nor Marshall was aware that [Piko] had been represented by the [OPD] in 2001 and 2002, for forgery and drug charge[s] in which Piko was sentenced to probation[,]" (3) "[i]n April of 2004, although then unknown by [Loy] and Marshall, the [OPD], through another [DPD], represented [Piko] in a Motion to Revoke Probation for the earlier [f]orgery offense[,]" (4) prior to July 14, 2004, when Loy sought an offer of proof from the prosecution regarding Piko, "[she] and Marshall were unaware . . . about the representation of [Piko,]"

(5) "neither [Piko] nor [Petitioner] is willing to waive any conflict of interest arising from their dual representation[,]" (6) "[i]n the current trial the defense is compelled to either cross-examine [Piko] or to call and question him as an adverse witness, using all available impeachment[,]" and "[Loy] would be duty bound to use the information from the prior conviction and any other impeachment she could find to adequately represent [Petitioner] and yet bound not to adversely impact Piko."

Loy declared that she had communicated with Charles Hite (Hite) from the Office of Disciplinary Counsel, and that "Hite gave an 'informal opinion' that the [OPD] had a conflict of interest and must move for a mistrial and move to withdraw from representing [Petitioner]." Loy concluded that the OPD "has a conflict of interest which requires a mistrial and withdrawal from representation of [Petitioner]."

In a Memorandum in Support of Petitioner's Motion, Petitioner argued that (1) in representing Petitioner, Loy would be required to impeach Piko, which would be "'directly adverse' to [Piko's] interest[,]" (2) the conflict of interest was not remedied by the fact that Petitioner and Piko were represented by different DPDs because under the Hawai'i Rules of Professional Conduct (HRPC), the OPD was "more akin to a 'law firm' than a 'governmental agency' under [HRPC] Rule 1.10[,]"[16] (3) [t]he

_____

[16]    HRPC Rule 1.10 states in relevant part:

(continued...)

[OPD] does not have in place any 'screens' or procedures to allow separate representation without conflict[,]" (4) the DPDs representing Petitioner and Piko "have the same secretary, the same supervisor, and share investigators and messengers and receptionists[,]" and (5) "the [DPDs] of the [OPD] are totally integrated into one firm within the meaning of the [HRPC]."

On July 20, 2004, the court held a hearing on Petitioner's Motion. At the hearing, Petitioner's witness Timothy Ho (Ho), the Acting Chief Deputy Public Defender, testified on cross-examination that DPDs shared client information with one another because "it is as if we are one firm and we can freely share that information among other attorneys within that firm in order to help us prepare cases." On July 21, 2004, the court orally denied Petitioner's Motion. Additionally, the court disqualified the OPD from further representing Piko.

On August 16, 2004, the court issued its "Findings of Fact [(findings)], Conclusions of Law [(conclusions)], and Order Denying [Petitioner's] Consolidated Oral Motions for Mistrial and

---

[16](...continued)
    (a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or 2.2.
    . . . .
    (c) A firm disqualification prescribed by this rule may be waived by the affected client by consent after consultation.
    (d) The disqualifications of Rules 1.7, 1.9(a), 1.9(b), or 1.11(c)(1) shall not be imputed to government lawyers provided the disqualified government lawyer has been screened from participation in the matter.

to Withdraw as Counsel." In sum, the court found that (1) "[n]either [] Burks nor the [OPD] have any matters pending with regard to Piko and the [OPD] has closed the file[,]" (2) "Loy had not learned of any secrets of Piko nor did she have knowledge of any confidential attorney-client communications had between Piko and [] Burks[,]" (3) "[Petitioner's] trial does not involve either the same or any matter substantially related to the facts and circumstances regarding the case in which Piko was placed on probation[,]" and (4) "Loy's ability to represent zealously the interests of [Petitioner] will not be affected by Piko's status as former client of the [OPD]."

The court determined that (1) "there is no basis to conclude that confidential attorney-client communications had between [] Burks and Piko will be communicated to either [] Loy or [] Marshall[,]" (2) "Piko's status is that of a prior or former client for purposes of conflict analysis[,]" (3) "Piko's status as a former or prior client makes State v. Richie, 88 Hawai'i 19, 960 P.2d 1227 (1998), distinguishable from the situation in the instant matter[,]" (4) neither HRPC Rule 1.7 nor Rule 1.9 prevented the OPD from representing Petitioner, (5) the ability of Loy and Marshall to represent Petitioner would "not be materially limited due to [Burks's] prior representation of Piko," and (6) the OPD was immediately disqualified from representing Piko.

The OPD continued to represent Petitioner at the resumption of his trial. On July 22, 2004, Loy called Piko as an adverse witness. Piko admitted on direct examination that in the parking lot during the incident related to Mark I, he asked Petitioner, "[W]hat you going do if I take [the camera] from you[?]"

2.

On July 30, 2004, the jury returned a verdict on the remaining counts in Mark I and Mark II. As to Mark I, the jury was unable to reach a verdict on the remaining counts. As to Mark II, the jury found Petitioner guilty of the included offense of attempted assault in the first degree of Officer Sung. On August 2, 2004, the court held a sentencing hearing, during which it dismissed Counts I and III in Mark I.

As to the remaining counts in Mark I, the court denied the prosecution's motion for extended term of imprisonment. However, in regard to the remaining counts in Mark II, the court granted the prosecution's motion for extended term of imprisonment,

> finding that [Petitioner] was a persistent and multiple offender and that extended terms of imprisonment were necessary for the protection of the public. Accordingly, [the court] sentenced [Petitioner] to an extended term of imprisonment of life without the possibility of parole for Count I in *Mark II*, rather than the term of life with the possibility of parole that would otherwise apply to a second degree murder conviction. See HRS § 706-661 (Supp. 2003). The court also imposed extended terms of imprisonment on the other counts of conviction in Mark II.

Mark, 120 Hawai'i at 508, 210 P.3d at 31 (emphasis added).

F.

On appeal to the ICA, Petitioner argued nine different grounds for reversing or vacating his convictions and sentences. Petitioner argued that the court

> erred by (1) granting in part the Honolulu Police
> Department's (HPD) motion to quash a subpoena for certain
> Internal Affairs Division records; (2) admitting a slow
> motion version of a videotape taken during the incident at
> [] Baskin-Robbins and refusing [Petitioner's] proposed jury
> instructions on the videotape; (3) incorrectly instructing
> the jury on the justification of defense of others in the
> first and second trials; (4) referring the jury back to the
> court's instructions in response to a communication during
> deliberations in the first trial; (5) denying his motion for
> mistrial and his counsel's motion to withdraw during the
> second trial after it was discovered that the [OPD] had
> represented Piko; and (6) denying his motion for a mistrial
> after it was discovered during the second trial that Piko
> believed that he had made a deal with [Respondent] in
> exchange for his testimony in the first trial, and after a
> juror received an anonymous voice mail which suggested that
> the juror should "watch [her] back." [Petitioner] further
> argue[d] that [(7)] he was denied a fair trial and impartial
> jury in the first trial based on factors including
> prejudicial publicity and the prosecutor's questioning of
> witnesses during trial, and that [(8)] there was
> insufficient evidence to convict him of the attempted
> assault in the first degree of Officer Sung in the second
> trial. . . . [Petitioner] also argues that [(9)] the
> extended term sentences in Mark II violated his
> constitutional rights.

Id. The ICA rejected Petitioner's arguments with respect to his convictions and affirmed the decision of the court. Id. Not all of the arguments presented to the ICA were included in his Application to this court.

II.

Petitioner lists the following questions in his Application:

> 1) Did the [ICA] Err in Ruling That Any Error in the Jury
>    Instructions on Defense of Others Was Harmless Error?
> 2) Did the [ICA] Err in Ruling That the Trial Court Did
>    Not Err in Denying the Motion for Mistrial and
>    Withdrawal of Counsel in the Second Trial?

21

3)   Did the [ICA] Err in Ruling That [Petitioner] Was Not
     Denied a Fair Trial?
4)   Did the [ICA] Err in Not Remanding Mark II Only For
     Non-Extended Sentencing?

In seeking to reverse or vacate his convictions, Petitioner has

the burden to demonstrate that the ICA gravely erred.  See HRS

§ 602-59 (Supp. 2009).

Respondent filed a memorandum in opposition on

September 10, 2009.

III.

A.

As to Petitioner's first question, preliminarily, at

Petitioner's first trial, the court gave several jury

instructions regarding the defense of others.  In his

Application, Petitioner states that in his Opening Brief he

"argued plain error in all the court's instructions on Defense of

Others because they contained misleading and confusing language."

The ICA noted that "[t]he instructions were similar to each

other, with some exceptions that are not relevant to this

appeal."  Mark, 120 Hawai'i at 522, 210 P.3d at 45.  Petitioner

does not take issue with this conclusion, and only identifies one

jury instruction in his Application, Jury Instruction No. 65, in

arguing that the court's jury instructions on defense of others

were erroneous.  Thus, only Jury Instruction No. 65 in regard to

Petitioner's first trial is substantially examined.

It does not appear that Petitioner directly challenges

any jury instructions related to his second trial.  Petitioner's

22

Application refers to the second trial only once in regard to jury instructions. He states that "[t]he prosecutor made the same argument at the second trial" as he did at the first trial "that it was [Petitioner] who provoked the use of force by reaching for his gun first." However, Petitioner does not say what this argument had to do with any particular jury instruction given at his second trial. Additionally, Petitioner relates that "[t]he ICA found that '. . . there was no evidence establishing that [Petitioner] reasonably believed that Martin or Daughter would have been justified in using deadly force to protect themselves inside [] Baskin Robbins.'" (Quoting Mark, 120 Hawai'i at 528, 210 P.3d at 51. (Ellipsis in original.)) The ICA had reached this conclusion in regard to Petitioner's second trial. Similar to his reference to the prosecutor's argument, Petitioner does not explain why the ICA was incorrect in regard to any jury instructions given at his second trial.

Assuming, arguendo, that in his Application Petitioner has properly challenged jury instructions on defense of others in his second trial, "only one of those instructions, which related to the first degree attempted murder charge for Officer Sung and the lesser included offenses of that charge, resulted in a conviction." Mark, 120 Hawai'i at 527, 210 P.3d at 50. That jury instruction is discussed further infra.

B.

1.

Petitioner argues that "[b]y omitting and mixing up crucial elements of HRS [§] 703-304[17] and [HRS § 703-305 relating to the defense of others], the jury instructions on defense of others were confusing, misleading, and prejudicial." Relying on State v. Augustin, 101 Hawai'i 127, 63 P.3d 1097 (2002),[18] Petitioner asserts that "[u]nder HRS [§] 703-305, the

_____

17    HRS § 703-304, related to the defense of self, provides in relevant part as follows:

> (2)    The use of deadly force is justifiable under this section if the actor believes that deadly force is necessary to protect himself against death, serious bodily injury, kidnapping, rape, or forcible sodomy.
> (3)    Except as otherwise provided in subsections (4) and (5) of this section, a person employing protective force may estimate the necessity thereof under the circumstances as he believes them to be when the force is used without retreating, surrendering possession, doing any other act which he has no legal duty to do, or abstaining from any lawful action.
> (4)    The use of force is not justifiable under this section:
> (a)    To resist an arrest which the actor knows is being made by a law enforcement officer, although the arrest is unlawful; []
> . . . .
> 5)    The use of deadly force is not justifiable under this section if:
> (a)    The actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or
> (b)    The actor knows that he can avoid the necessity of using such force with complete safety by retreating or by surrendering possession of a thing to a person asserting a claim of right thereto or by complying with a demand that he abstain from any action which he has no duty to take[.]

(Emphases added.)

18    Augustin provides no support for Petitioner's position. In that case, this court analyzed a jury instruction that, like the jury instruction at issue here, was based on Hawai'i Pattern Jury Instructions-- Criminal (HAWJIC) No. 7.02 on defense of others. Petitioner argues that "[e]ven in

(continued...)

jury is supposed to look at the circumstances as the defendant believed them to be, not the third party." Petitioner takes issue with paragraphs 5 and 6 of Jury Instruction No. 65,[19] asserting that paragraphs 5 and 6 "told the jury that even if the actor had a reasonably mistaken belief, it did not matter if the third party himself or herself could not reasonably believe that force was immediately necessary to protect himself or herself."

2.

Respondent does not argue that the court's jury instructions were not erroneous. Instead, Respondent argues that

---

[18](...continued)
Augustin, [this court] recognized that the actor could have a reasonable but mistaken belief." In Augustin, the defendant challenged a different part of the jury instruction, which "advis[ed] the jury to consider [the defendant's] justification claims 'from the viewpoint of a reasonable person in [the defendant's] position under the circumstances of which [the defendant] was aware or as [the defendant] reasonably believed them to be[.]'" 101 Hawai'i at 127, 63 P.3d at 1097 (emphasis added). A majority of this court upheld that statement, because it would be "error to judge the reasonableness of a defendant's viewpoint based on circumstances 'shown in the evidence' but of which the defendant is not 'aware.'" Id.
   In this case, Jury Instruction No. 65 contained language identical to that challenged above in Augustin. Paragraph 4 stated that "[t]he reasonableness of the Defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the Defendant's position under the circumstances of which the Defendant was aware or as the Defendant reasonably believed them to be." (Emphasis added.) Thus, as in Augustin, paragraph 4 indicated to the jury that Petitioner "could have a reasonable but mistaken belief."

[19]    As noted above, paragraphs 5 and 6 stated as follows:

          [5] The third person would have been justified in using force upon or toward [Officer Gaspar] if he or she reasonably believed that such force was immediately necessary to protect himself or herself on the present occasion against the use of unlawful force by [Officer Gaspar].
          [6] The third person would have been justified in using deadly force upon or toward [Officer Gaspar] if he or she reasonably believed that deadly force was immediately necessary to protect himself or herself on the present occasion against death, serious bodily injury, or kidnapping.

"there is no 'reasonable possibility that the error contributed to [Petitioner's] conviction[s]' for the murder of Officer Gaspar (first trial), the assault of Officer Sung (second trial), or the assault of Paikai (first trial)[.]"

3.

The ICA held that paragraph 3[20] of Jury Instruction No. 65 "makes clear that the jury must evaluate the issue '[u]nder the circumstances as the Defendant reasonably believed them to be,' and paragraph 4 . . . further discusses how to assess the reasonableness of the defendant's belief." Mark, 120 Hawai'i at 524, 210 P.3d at 47. According to the ICA, "[v]iewed in the context of the entire instruction, paragraphs 5 and 6 did not improperly suggest that the jury should decide whether the third party was in fact justified in using force or deadly force." Id. (footnote omitted). Instead, the ICA concluded that "they provided the jury with the underlying principles to evaluate the reasonableness of the defendant's belief that the third party would be so justified." Id. Thus, the ICA held that Petitioner's argument as to the jury instructions regarding the defense of others was "without merit." Id.

C.

1.

This court has stated that "'[w]hen jury instructions or the omission thereof are at issue on appeal, the standard of

---

[20]    See discussion infra.

review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading[.]'" State v. Gomes, 93 Hawai'i 13, 18, 995 P.2d 314, 319 (2000) (quoting State v. Kinnane, 79 Hawai'i 46, 49, 897 P.2d 973, 976 (1995)).  In this connection, "[e]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial." State v. Aganon, 97 Hawai'i 299, 302, 36 P.3d 1269, 1272 (2001) (internal quotation marks and citation omitted).  However, "jury instructions to which no objection has been made at trial will be reviewed only for plain error." State v. Sawyer, 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998) (citing State v. Pinero, 75 Haw. 282, 292, 859 P.2d 1369, 1374 (1993)).  In this case, Petitioner did not object to the jury instructions he challenges on appeal, and thus, the jury instructions are reviewed for plain error.

2.

As pointed out by the ICA, Jury Instruction No. 65 was substantively identical to Hawai'i Pattern Jury Instructions-- Criminal (HAWJIC) No. 7.02 on defense of others.  However, appellate courts are not bound by pattern jury instructions. State v. Nupeiset, 90 Hawai'i 175, 182 n.9, 977 P.2d 183, 190 n.9 (App. 1999).  In order to determine whether Jury Instruction No. 65 was erroneous, it "must be examined in the context of the

justification defenses[21] of the use of force in the defense of others and the use of force in the defense of oneself." Id. at 179-80, 977 P.2d at 187-88 (footnote altered). The justification defense of the "[u]se of force for the protection of other persons" is codified in HRS § 703-305, which provides in relevant part as follows:

> (1) Subject to the provisions of this section and of section 703-310,[22] the use of force upon or toward the person of another is justifiable to protect a third person when:
>     (a) Under the circumstances as the actor believes them to be, the person whom the actor seeks to protect would be justified in using such protective force; and
>     (b) The actor believes that the actor's intervention is necessary for the protection of the other person.
> (2) Notwithstanding subsection (1):
>     (a) When the actor would be obliged under section 703-304 to retreat, to surrender the possession of a thing, or to comply with a demand before using force in self-protection, the actor is not obliged to do so before using force for the protection of another person, unless the actor knows that the actor can thereby secure the complete safety of such other person; and
>     (b) When the person whom the actor seeks to protect would be obliged under section 703-304 to retreat, to surrender the possession of a thing or to comply with a demand if the person knew that the person could obtain complete safety by so doing, the actor is obliged to try to cause the person to do so before using force in the person's protection if the actor knows that the actor can obtain the other's complete safety in that way[.]

(Emphases added.)

---

21      Nupeiset pointed out that "HRS § 703-301(1) (1993) provides, 'In any prosecution for an offense, justification, as defined in sections 703-302 through 703-309, is a defense.'" 90 Hawai'i at 180 n.3, 977 P.2d at 188 n.3.

22      The parties have not argued that HRS § 703-310, which limits the defense of others where the defendant has a reckless or negligent belief or engages in reckless or negligent conduct, is at issue in this case.

The commentary to HRS § 703-305 states that this section "permits a person to use force to protect another person <u>when the actor believes the other person would have been justified in using force to protect himself</u> and he believes that his intervention is necessary to protect the other person."[23] (Emphasis added.) In the context of the use-of-force defenses, "'[b]elieves' means reasonably believes[.]" HRS § 703-300 (1993). In order for "the other person [to] have been justified in using force to protect himself," the following requirements set forth in HRS § 703-304 regarding self-protection would apply:

> (1) Subject to the provisions of this section and of section 703-308,[[24]] <u>the use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person on the present occasion.</u>
> (2) <u>The use of deadly force is justifiable under this section if the actor believes that deadly force is necessary to protect himself against death, serious bodily injury,</u> kidnapping, rape, or forcible sodomy.

(Emphases added.) Thus, under HRS § 703-305, in order to use force to protect a third person, the actor must have a reasonable belief that, as to the third person, (1) "force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person on the present occasion,"

---

[23] Additionally, the commentary to HRS § 703-305 states that "[t]his formulation covers situations in which the other's infirmity, infancy, or other physical condition makes him especially unable to protect himself or susceptible to injury, <u>even though the actor, in a similar predicament, might not himself have been justified in using force</u>." (Emphasis added.)

[24] HRS § 703-308, which justifies the use of force upon another person if the force is enough to prevent, <u>inter alia</u>, suicide or the commission of a crime, is not relevant to this case.

or (2) "deadly force is necessary to protect himself against death, serious bodily injury, kidnapping, rape, or forcible sodomy."

This conclusion is supported by the Model Penal Code and Commentaries (Official Draft and Revised Comments 1985) [hereinafter MPC] § 3.05. It has been observed that "HRS § 703-305 is nearly identical to [the MPC]." Nupeiset, 90 Hawai'i at 180, 977 P.2d at 188. The commentary to the MPC states in pertinent part that

> given the circumstances as the actor believes them to be, the third person must legally be justified in using such protective force. Thus, if the third person were resisting an arrest by a known police officer, or if he were attempting to effect an arrest with excessive force, he would have no defense, and, if the circumstances were known to the actor, the actor would have no defense either.

MPC § 3.05 cmt. 1 at 64 (emphases added). In other words, if the actor knew that the third person could not reasonably believe that the use of force was justified, the actor could not use force in the protection of the third person.

### D.

As stated before, Petitioner argued that paragraphs 5 and 6 "told the jury that even if the actor had a reasonably mistaken belief, it did not matter if the third party himself or herself could not reasonably believe that force was immediately necessary to protect himself or herself." Petitioner appears to argue, as he did in his Opening Brief, that "the jury should not be deciding whether the third person had the right to defend

[himself]. The focus should have been on whether the defendant reasonably believed [he or she] had that right."

Paragraph 5, related to the use of force, and paragraph 6, related to the use of deadly force, did address the reasonable belief of the third person, rather than the defendant. However, these paragraphs must be read in conjunction with paragraph 3 of Jury Instruction No. 65.[25] Paragraph 3 stated that "[t]he use of force upon or toward another person is justified to protect a third person when . . . [u]nder the circumstances as the Defendant reasonably believed them to be, the third person would have been justified in using such force to protect himself or herself[.]" (Emphasis added.) Paragraph 3 makes clear that the focus of the jury should be upon "the circumstances as the Defendant reasonably believed them to be[.]" Viewing paragraphs 5 and 6 in the context of paragraph 3, Jury Instruction No. 65 correctly stated that the defendant must have reasonably believed that the third person was justified in believing that "force was immediately necessary to protect himself or herself" or "that deadly force was immediately necessary to protect himself or herself[.]" Thus, paragraphs 5 and 6, taken in conjunction with

---

[25]     The court instructed the jury to view the instructions as a whole, stating that,

> [y]ou must consider all of the instructions as a whole and consider each instruction in light of all of the others. Do not single out any word, phrase, sentence or instruction and ignore the others. Do not give greater emphasis to any word, phrase, sentence or instruction simply because it is repeated in these instructions.

paragraph 3 of Jury Instruction No. 65, was not an incorrect statement of the law.

IV.

A.

1.

Petitioner also argues that paragraph 7 of Jury Instruction No. 65 was erroneous, apparently for two reasons. First, Petitioner claims that (1) "[b]y repeatedly using the word 'Defendant,' the focus is on the defendant, not the third party[,]" and (2) "[t]he jury might have thought [Petitioner] could have either retreated or used non-deadly force[,]" but "the circumstances would be different if he were also looking out for his pregnant girlfriend or his young daughter who was sick with the flu." Second, Petitioner argues that (1) because "[t]he prosecution essentially argued that it was [Petitioner] who provoked the use of force by reaching for his gun first[, t]he court's confusing instruction would have led the jury to incorrectly conclude that this prohibited [Petitioner's] Defense of Others defense[,]" and (2) "[b]ased on what had happened before [with Piko and Paikai], [Petitioner] had every reason to believe that [Daughter] or [Martin] would get seriously injured or kidnapped."

2.

As to paragraph 7 of Jury Instruction No. 65, the ICA in effect divided the paragraph into two parts and analyzed each

part separately. As to "the first part of paragraph 7 of the instruction, [(clause (a))] which provided that the use of deadly force is not justified 'if the Defendant, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter[,]'" the ICA "agree[d] with [Petitioner] that this part of the instruction does appear to mix principles of self-defense with those of defense of others in a way that could be confusing to a jury." Mark, 120 Hawai'i at 527, 210 P.3d at 50 (emphasis added). However, the ICA held that the error was harmless because "[t]here [was] nothing in the record to suggest that [Petitioner], with the intent of causing death or serious bodily injury, did anything in [regard to Mark I or Mark II] to provoke the use of force against himself." Id. The ICA concluded that "[t]his forecloses the possibility that the jury would have denied the defense of others justification to [Petitioner] based on the erroneous part of the instruction." Id.

In regard to the second part of paragraph 7, (clause (b)), the ICA held that it was not erroneous because,

> [r]ead in context of the entire instruction, the "necessity" for using force in paragraph 7 refers to the threat to the third party, and the instruction thus advises the jury that the defendant must retreat only if he or she can avoid "the necessity of such force with complete safety" of that third party.

Id. at 526, 210 P.3d at 49 (emphasis added). The ICA also concluded that even if clause (b) were erroneous, the error would be harmless beyond a reasonable doubt because (1) in regard to

Mark I, (a) there was no evidence to "support a reasonable belief on [Petitioner's] part that Martin was justified in using deadly force against Piko, let alone Paikai[,]" and (b) "the jury was also instructed on self-defense with regard to the counts at issue here, and necessarily rejected that defense in finding [Petitioner] guilty[,]" and, therefore, "it is not reasonably possible that a jury would find that [Petitioner] lacked justification to use deadly force to protect himself, but would find that he was justified in using it to protect . . . Martin[,]" and (2) in regard to Mark II, (a) "th[e] evidence foreclosed the possibility that [Petitioner] could have retreated in any event[,]" (b) "the jury was also instructed on self-defense with regard to the counts at issue here, and necessarily rejected that defense in finding [Petitioner] guilty[,]" and, therefore, "it is not reasonably possible that a jury would find that [Petitioner] lacked justification to use deadly force to protect himself, but would find that he was justified in using it to protect Daughter and Martin[,]" (c) defense counsel conceded that the use of deadly force by Daughter at Baskin-Robbins would have been excessive, and (d) Petitioner could not "have reasonably believed that there was a threat to Martin at [] Baskin-Robbins that would have justified the use of deadly force by her." Id. at 526-27, 210 P.3d at 49-50 (emphases added).

34

B.

To reiterate, paragraph 7 of Jury Instruction No. 65 stated that

> [t]he use of deadly force is not justifiable [(a)] if the Defendant, with the intent of causing death or serious bodily injury, <u>provoked</u> the use of force against himself in the same encounter, or [(b)] if the Defendant knows that he can avoid the necessity of using such force with complete safety by <u>retreating</u>.

(Emphases added.)  Paragraph 7 is identical to language contained in HAWJIC 7.02, which sets forth the pattern jury instruction of defense-of-others.  The commentary to HAWJIC 7.02 does not indicate why such language is included in the instruction. However, as noted above, "[t]he instructions . . . are not binding on the Hawai'i appellate courts."  <u>Nupeiset</u>, 90 Hawai'i at 182, 977 P.2d at 190 (citation omitted).

In this case, contrary to the ICA's conclusion that "the 'necessity' for using force in paragraph 7 refers to the threat to the third party," <u>Mark</u>, 120 Hawai'i at 526, 210 P.3d at 49, the plain language of paragraph 7 is substantively identical to HRS § 703-304(5), dealing with <u>self-protection</u>.  That HRS section states in relevant part that

> [t]he use of deadly force is not justifiable under this section if . . . [t]he actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or . . . [t]he actor knows that he can avoid the necessity of using such force with complete safety by retreating[.]

Additionally, as to clause (a) of paragraph 7, nothing in HRS § 703-305 relating to the protection of other persons involves the concept of provocation on the part of the defendant.  Thus,

35

contrary to the ICA's "necessity" reasoning, clause (a) is a clearly erroneous statement of the law.

As to clause (b), the manner in which HRS § 703-305 relating to defense of others deals with retreat is fundamentally different from the language set forth in clause (b) of paragraph 7. HRS § 703-305(2)(a) states that "[w]hen the actor would be obliged under section 703-304 to retreat,[26] . . . the actor is not obliged to do so before using force for the protection of another person, unless the actor knows that the actor can thereby secure the complete safety of such other person[.]" (Emphases added.) On the other hand, HRS § 703-305(2)(b) deals with the obligation of the actor if the third person is obliged to retreat:

> When the person whom the actor seeks to protect would be obliged under section 703-304 to retreat, . . . if the person knew that the person could obtain complete safety by so doing, the actor is obliged to try to cause the person to do so before using force in the person's protection if the actor knows that the actor can obtain the other's complete safety in that way[.]

(Emphasis added.) As noted before, the language of clause (b) of paragraph 7 relates to self-protection and, thus, only addresses retreat in the context of self-protection. Thus, clause (b) of paragraph 7 conflicts with the retreat provision relating to defense of others in HRS § 703-305. Accordingly, clause (b) of

---

[26] Under HRS § 703-304(5)(b) related to self-protection, the actor would be obliged to retreat if "[t]he actor knows that he can avoid the necessity of using [deadly force] with complete safety by retreating or by surrendering possession of a thing to a person asserting a claim of right thereto or by complying with a demand that he abstain from any action[.]"

paragraph 7 was also erroneous.

As said before, there is no explanation in the commentary to HAWJIC 7.02 as to why the language in paragraph 7 should be included in an instruction on the justification of defense of others. Paragraph 7 obviously relates to the justification of self-defense, and thus would appear to have no place in an instruction related to the defense of others. HRS § 703-305 says nothing about provocation, and the concept of retreat set forth in HRS § 703-305(2) is entirely different from the concept of retreat as discussed in clause (b) of paragraph 7.

The ICA, despite concluding that clause (a) of paragraph 7 "appear[ed] to mix principles of self-defense with those of defense of others in a way that would be confusing to a jury," Mark, 120 Hawai'i at 527, 210 P.3d at 50, did not address the inclusion of paragraph 7 in the HAWJIC. Moreover, the ICA concluded that clause (b) of paragraph 7 was not erroneous, because it "referred to the threat to the third party, and the instruction advises the jury that the defendant must retreat only if he or she can avoid 'the necessity of such force with complete safety' of that third party." Id. at 526, 210 P.3d at 49. Inasmuch as paragraph 7 is erroneous, the ICA's decision is incorrect. Thus, contrary to the ICA's decision, we hold that the language in paragraph 7 should not be included in HAWJIC 7.02.

C.

Because the giving of paragraph 7 rendered Jury Instruction No. 65 erroneous, it must be determined whether such error was harmless. See Nupeiset, 90 Hawai'i at 184, 977 P.2d at 192 (stating that while the challenged jury instruction was "an incomplete statement of the law, we believe any error in giving it was harmless"). Preliminarily, as noted above, the ICA held that "[e]ven if we were to find that [paragraph 7] was a potentially misleading statement of the law, the error would be harmless beyond a reasonable doubt" because

> the jury was also instructed on self-defense with regard to the counts at issue here, and necessarily rejected that defense in finding [Petitioner] guilty [of the attempted assault of Paikai and the second degree murder of Officer Gaspar]. Given the evidence at trial, it is not reasonably possible that a jury would find that [Petitioner] lacked justification to use deadly force to protect himself, but would find that he was justified in using it to protect Daughter and Martin (at [] Baskin-Robbins) or Martin (at the church parking lot).

Mark, 120 Hawai'i at 526, 210 P.3d at 49 (emphases added).

However, as Petitioner stated, "'[a]n intervenor's right to react is not strictly coterminous with a participant's right to self-defense.'" (Quoting Alexander v. State, 447 A.2d 880, 887 (Md. Ct. Spec. App. 1982).) This statement is supported by the commentary to HRS § 703-305, which, as noted supra at note 23, states that "[t]his formulation covers situations in which the other's infirmity, infancy, or other physical condition makes him especially unable to protect himself or susceptible to injury, even though the actor, in a similar predicament, might not himself have been justified in using force." (Emphasis

38

added.)  As the commentary makes evident, it is possible that a defendant could be justified in using force to protect <u>another person</u>, even if the defendant himself or herself was not justified in using force for self protection.  Therefore, contrary to the ICA's conclusion, it does not follow that a jury's rejection of a defendant's defense of self-defense, as in this case, would necessarily result in its rejection of a defense of defense of others, and, accordingly, the ICA also erred in this aspect of its reasoning.

D.

1.

In regard to clause (a) of paragraph 7 as it relates to <u>provocation</u>, the following evidence with respect to <u>Mark I</u> was adduced at Petitioner's first trial.[27]  As discussed <u>supra</u>, Petitioner testified that he was being approached from opposite sides by Piko and Paikai, when Piko "whacked" Petitioner's car with his hand.  Piko then turned to Petitioner and asked Petitioner what he would do if Piko and Paikai took the camera from him.  After giving the camera to Piko, Piko turned to Petitioner and stated that he and Paikai were "just going to take everything," which Petitioner took to mean that he and Martin were being robbed.  Petitioner thought Piko and Paikai were going to "trap [him] . . . and beat [him] up."

---

[27]    Petitioner does not point to any difference in the evidence adduced at his first and second trials related to the provocation of force on his part.

Paikai testified that while Petitioner and Piko were having a conversation, "the discussion got heated, and I guess the discussion was over where the property was going to go at the time." Paikai stated that next, "[a]ll I seen was [Petitioner] give him the box and pull a gun." According to Paikai, he saw Petitioner making "gestures" "like just before a fight is about to start[.]" He saw Piko "raising [his] hands out with [his] palms open," as if Piko was saying "what or something." Paikai related that Petitioner pulled the handgun and pointed it "[r]ight at [Piko's] head" "[a]s soon as he put [the box] in [Piko's] hand." Paikai saw Piko "lift[] up the box[,]" at which point Petitioner "[f]ired a round[.]" Piko then turned and ran, while Petitioner "pull[ed] off maybe one or two more rounds[.]"

Paikai stated that after Piko ran away, "[Petitioner] turned his sights on [Paikai]." Paikai stated that Petitioner aimed the gun at him, "and I ran closer to [Petitioner's] car, you know, making it a little harder for him to shoot me. And I think he pulled off two more shots, and then that's when I got one in the leg[.]"

Piko gave the following testimony about what happened between him and Petitioner during the exchange of the box:

> [Petitioner] started explaining to me about something, so I told him what if I just take this from you, what you goin' do? . . . That's when he told me, you know what, here. He went hand the camera to me, and when I went grab 'em, he just went pull out his gun.

(Emphasis added.) According to Piko, "[a]fter that, all I heard

was pah, and I just - I was gone." Piko testified that he did not "touch [Petitioner] that night" or "verbally threaten him with words[.]" He stated that he did not "do anything to physically threaten [Petitioner]," and that the discussion he was having with Petitioner "wasn't even [an] argument."

2.

HRS § 703-300 defines "force" as "any bodily impact, restraint, or confinement, or the threat thereof." (Emphasis added.) As to Mark I, based on Petitioner's testimony discussed above, it would appear that he felt threatened by force from Piko and Paikai. However, nothing in Petitioner's testimony indicates that he provoked such a threat. To "provoke" means "to incite to anger" or "to bring about deliberately[.]" Webster's Third New Int'l Dictionary 1827 (1961). Petitioner's testimony indicates that in speaking to Piko and giving him the box, Petitioner did not provoke the threat of the use of force against himself. Thus, had the jury believed Petitioner's testimony, the effect of clause (a) of paragraph 7 would have been harmless, because no provocation occurred on Petitioner's part to invite the threat of force. If the jury believed Petitioner's testimony, the limitation in clause (a) of paragraph 7 would have been harmless error, because Petitioner's testimony did not support a finding that he had provoked the threat of force.

As to Paikai's testimony, nothing in his testimony indicated that he used force or the threat of force against

Petitioner in <u>Mark I</u>. Paikai did not testify that he heard the actual conversation between Petitioner and Piko, but only that it appeared to get "heated." Piko testified that he "told [Petitioner, W]hat if I just take this from you, what you goin' do?"

Piko's foregoing statement could be interpreted as the threat of force, but neither Piko nor Paikai testified that such force was provoked <u>by Petitioner</u>. Instead, Piko testified that "[Petitioner] started explaining to me about something," at which point he asked Petitioner what Petitioner would do if Piko took the box from him. The fact that Petitioner was "explaining . . . something" cannot be interpreted as provoking force by Piko or Paikai. Similarly, Paikai's testimony that Petitioner was making "gestures" is not an indication that Petitioner provoked the use of force by Piko or Paikai. Thus, had the jury believed Piko's and Paikai's testimony, the error in clause (a) of paragraph 7 relating to the provocation of Petitioner would have been harmless, because their testimony did not support a finding that Petitioner had provoked the use of force.

3.

Turning to clause (b) of paragraph 7, that clause stated that "[t]he use of deadly force is not justifiable . . . if the Defendant knows that he can avoid the necessity of using such force with complete safety by <u>retreating</u>." (Emphasis added.) As noted before, the language in this clause pertains

only to self protection.  HRS § 703-300 defines "deadly force" as follows:

> "Deadly force" means force which the actor uses with the intent of causing or which the actor knows to create a substantial risk of causing death or serious bodily harm: <u>Intentionally firing a firearm in the direction of another person or in the direction which another person is believed to be constitutes deadly force.  A threat to cause death or serious bodily injury, by the production of a weapon or otherwise, so long as the actor's intent is limited to creating an apprehension that the actor will use deadly force if necessary, does not constitute deadly force</u>.

(Emphasis added.)

It is undisputed that Petitioner "[i]ntentionally fir[ed] a firearm in the direction of another person," <u>id.</u>, namely Piko and Paikai, and thus used deadly force, twice in the <u>Mark I</u> incident.  As to the use of deadly force in regard to Piko, however, the jury was unable to reach a verdict.  Thus, Petitioner's use of deadly force and Petitioner's duty to retreat in regard to Piko is not further discussed.[28]

In regard to Paikai, it does not appear that any witness testified directly as to whether Petitioner could have retreated, and thus avoid the necessity of using deadly force with complete safety.  Petitioner stated that after Piko had run off, he turned to look for Paikai, and saw him kneeling down at the front of Petitioner's car.  Petitioner stated that he "[f]elt like . . . [Paikai] might have a weapon or something[,]" and he

---

[28]    As noted <u>supra</u>, the charges related to Piko were ultimately dismissed after the jury was again unable to reach a verdict on them in the second trial.

"was real scared[.]" Petitioner then reached over the car and shot Paikai in the leg in order to "stop him."

Nothing in this testimony indicates that Petitioner knew that he could avoid the necessity of using deadly force by retreating. According to Petitioner, he saw Paikai "kneeling down, and . . . coming around [Petitioner's] car towards [Petitioner]." Petitioner thought Paikai might have a weapon, and stated that he shot Paikai to "stop him." The fact that Petitioner felt that he had to "stop" Paikai indicates that Petitioner did not believe that he could have retreated with complete safety. Petitioner did not testify as to any knowledge he may have had in regard to avoiding the necessity of using force. Thus, there was no evidence adduced at trial that, as stated in clause (b), Petitioner knew he could have retreated with complete safety, thereby "avoid[ing] the necessity of using such force[.]" HRS § 703-304(5)(b). As a result, clause (b) as it relates to Mark I could not be applied and, hence, was also harmless error.

E.

1.

In regard to clause (a) of paragraph 7 of Instruction No. 65 as it relates to Mark II, as discussed supra, Petitioner testified that he did not see Officer Gaspar or Officer Sung before they grabbed him, and thus, nothing in Petitioner's testimony would indicate that he provoked the use of force

against himself. However, as noted before, Officer Sung testified that after showing Petitioner his badge, he saw Petitioner "reaching for something, and from my police training and experiences, usually when they reach for something in their pocket, usually it means weapon, so I'm telling him pull your hands up, police, and then I kept on approaching [Petitioner]." Officer Sung stated that he grabbed for Petitioner's right hand in order to stop Petitioner from "[r]eaching for any kind of weapons, possibly gun or possibly knife, possibly harming other people."

This testimony thus contradicts the ICA's conclusion that "[t]here is nothing in the record to suggest that [Petitioner], with the intent of causing death or serious bodily injury, did anything in [] Baskin-Robbins to provoke the use of force against himself." Mark, 120 Hawai'i at 527, 210 P.3d at 50 (emphasis added). Officer Sung testified that Petitioner reached for his pocket, which, in Officer Sung's experience, usually meant that the person was reaching for a weapon. Officer Sung testified that he grabbed for Petitioner's hand, i.e., used force on Petitioner, in order to prevent Petitioner from reaching for a weapon. Since weapons are generally used for the purpose of causing death or serious bodily injury, Officer Sung's testimony is evidence that Petitioner provoked the use of force against himself.

Because clause (a) of paragraph 7 stated that the protection of other persons defense was <u>unavailable</u> to Petitioner if he provoked the use of force, clause (a) as it related to <u>Mark II</u> was potentially harmful. Based on the evidence, the jury could have believed, following the direction in clause (a) of paragraph 7, that Petitioner provoked the use of force against himself, thus <u>disqualifying</u> him from claiming the defense of others defense. Inasmuch as paragraph 7, clause (a), of Jury Instruction No. 65 was erroneous, the jury could have reached a decision that was legally infirm.

2.

As to clause (b) of paragraph 7, it is clear from the testimony of all the witnesses that Petitioner did not know he could have retreated with complete safety in Baskin Robbins. To retreat means "to draw back" or "withdraw." <u>Webster's Third New Int'l Dictionary</u> at 1940. But prior to Petitioner's use of force, he was engaged in a struggle with the officers, who, according to Officer Sung, "grabb[ed]" and "restrain[ed]" Petitioner. Petitioner testified that the men were "grabbing" him, and "holding onto [him]," and that while the first two men were grabbing him, a third man came up behind Petitioner and grabbed him in a "bear hug." This testimony indicates that Petitioner could not have retreated at all, i.e., "withdrawn," because he was being "restrain[ed]" by the officers at the time.

Clause (b) of paragraph 7 instructed the jury that if Petitioner knew that he could have retreated with complete safety, the defense of others defense was unavailable to him. However, as discussed above, there was no evidence adduced at trial that Petitioner knew he could have retreated with complete safety, thereby "avoid[ing] the necessity of using such force[.]" In fact, the evidence indicated that Petitioner was unable to retreat because he was being held by the officers. Inasmuch as there was no evidence that Petitioner knew he could have retreated with complete safety, there was no evidence on which the jury could not have found that the limitation in clause (b) applied to Petitioner. See State v. Klinge, 92 Hawai'i 577, 592, 994 P.2d 509, 524 (2000) ("As a rule, juries are presumed to follow all of the trial court's instructions." (Quoting State v. Knight, 80 Hawai'i 318, 327, 909 P.2d 1133, 1142 (1996).)) (Ellipsis omitted.) Thus, clause (b) as it relates to Mark II was harmless error.

### 3.

As noted supra, clause (a) of paragraph 7 relating to provocation by Petitioner was erroneous and, thus, potentially harmful error with respect to Mark II. Nevertheless, it does not appear there was any evidence upon which an instruction as to the defense of others, in this case Martin and Daughter, could be based. In order to establish whether Petitioner's substantial rights were affected, it must be determined "whether, from the

objective point of view of a reasonable person, the defendant's use of force was necessary for the protection of a person who would be justified in using such force, under the circumstances as the defendant subjectively believes them to be." State v. Pavao, 81 Hawai'i 142, 145, 913 P.2d 553, 556 (App. 1996). As to the counts in Mark II that Petitioner was charged with in his first trial, only two related to Petitioner's use of force, and the jury only returned a conviction on Count I, regarding the second degree murder of Officer Gaspar.

Any "protective force" Petitioner may have used in that count amounted to deadly force, because it involved the shooting of Officer Gaspar. See HRS § 703-300 ("Intentionally firing a firearm in the direction of another person . . . constitutes deadly force.") In his Application, Petitioner argues that he "had every reason to believe that [Daughter] or [Martin] would get seriously injured or kidnapped." Thus, it must be determined whether, under the circumstances as Petitioner must reasonably believe them to be, Martin or Daughter would have been justified in using deadly force.

Petitioner points to the following testimony in support of his claim that he reasonably believed that Martin or Daughter would have been justified in using deadly force: (1) Petitioner testified that since the incident in Mark I "he had been hearing threats against himself and Martin," (2) "[o]ne of the reasons why he did not turn himself in right away was because he was

afraid of what would happen to Martin if she were left alone," (3) Petitioner "testified that, when he and Martin were being chased by Piko, he thought he saw one of the men holding a gun," and (4) "[t]he last time he saw Martin, she was by his side as he reached to put the necklace on [Daughter, and, i]n his mind, these were three large men, presumably friends of Piko and Paikai, who had gang tackled him without provocation."

Neither Martin nor Daughter testified at Petitioner's trial. Several witnesses in Baskin Robbins at the time of the struggle did testify. For example, Sennett, the mother of Daughter, testified that Petitioner was "not even a foot away from [Daughter]" when Officer Gaspar and Officer Sung entered Baskin Robbins. According to Sennett, Petitioner "started to back up a little[,]" and then

> [t]hey walked up to him and he still had the necklace in his hand, and as they were reaching for him, he dropped the necklace, and they said, "Shane Mark," . . . then he bent down and started like going backwards, and the police officers were trying to get him to stand completely up, and he kept going and backed into the counter.

Kortz, Sennett's boyfriend, testified that as Petitioner was attempting to place the necklace around Daughter's neck, "two gentlemen came walking in from behind me and walked past me and past [Sennett] towards [Petitioner], and they made a comment to him or said something to him. [Petitioner] started to back up. When they – the two gentlemen started to grab for [Petitioner] and started to struggle[.]"

As discussed above, Petitioner testified that the first time he noticed Officer Gaspar and Officer Sung was when they attempted to grab him.  Officer Sung testified that after he and Officer Gaspar had shown Petitioner their badges, he saw Petitioner reaching for something in his pocket, and immediately reached out for Petitioner.  Petitioner points to no testimony by any of the witnesses at Baskin Robbins indicating that the officers used force or the threat of force against Martin or Daughter.  Although Sennett testified that Petitioner was near Daughter at the time the officers grabbed him, the testimony indicates that the officers grabbed directly for Petitioner, and made no threats or attempts to grab Martin or Daughter.

As noted before, Petitioner testified that he and Martin had been "hearing threats" and that he was "afraid of what would happen to Martin if she were left alone."  However, Petitioner's own testimony indicates that under the circumstances known to him, the men were grabbing for him, and not for Martin or Daughter.  As Petitioner stated he "had a feeling" that the men were "going to pull me out of the store" to "[t]ake me someplace and kill me."  Nothing in Petitioner's testimony or in the testimony of the other witnesses would support a reasonable belief that it was necessary for Petitioner to use deadly force in order to protect Martin or Daughter.

Furthermore, there could not have been a reasonable belief that either Martin or Daughter would have been justified

in using deadly force. Although Petitioner did testify that he was "pretty scared" because Daughter could have gotten hurt, it does not appear that Petitioner offered testimony in this regard as to Martin. As discussed above, the witnesses' testimony indicated that the officers grabbed Petitioner, focusing their attention on him and no one else. At the settling of Jury Instruction No. 65, Loy, Petitioner's counsel, herself stated, "I don't think [Daughter] would have the right to use deadly force. Deadly force is a greater degree of force than is justified." Petitioner would not have been justified in using force that neither Martin nor Daughter were justified in using, "as the defense applies only when the third person being defended could himself or herself legitimately employ force." Pavao, 81 Hawai'i at 147, 913 P.2d at 558.

Because under the circumstances as Petitioner believed them to be, a reasonable person would not believe that Martin or Daughter would be justified in using deadly force, Petitioner was not justified in using deadly force, purportedly in their defense. Hence, Petitioner was not prejudiced by the error in clause (a) of paragraph 7 in Jury Instruction No. 65 with respect to Mark II. See id. (holding that because the defendant could not have reasonably believed that the third person would have been justified in using force, the trial court's finding of guilt was supported by substantial evidence). Although "a defendant is entitled to an instruction on every defense or theory of defense

having any support in the evidence," State v. Cabrera, 90 Hawai'i 359, 370, 978 P.2d 797, 808 (1999) (citation omitted), based on the evidence discussed above, there was no rational basis on which the jury could conclude that Petitioner was justified in using force for the protection of others. See State v. Kupihea, 98 Hawai'i 196, 206, 46 P.3d 498, 508 (2002) (holding that trial court was not required to include all statutory definitions in its instructions but, rather, "should refer only to those [definitions] having a rational basis in the evidence adduced at trial and not otherwise excludable").

Consequently, viewing the evidence as a whole, there is no reasonable possibility that the inclusion of paragraph 7, clause (a) relating to provocation, in Jury Instruction No. 65 contributed to Petitioner's conviction. See State v. Arceo, 84 Hawai'i 1, 12, 928 P.2d 843, 854 (1996) ("Error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and . . . [i]n that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction.") (Emphasis added.) (Citation omitted.) Based on the entire proceedings, clause (a) of paragraph 7 in Jury Instruction No. 65 as it relates to Mark II was harmless error.

F.

In Petitioner's second trial, the court's instruction on defense of others was identical to Jury Instruction No. 65,

except that the language in paragraph 7 related to retreat had

been altered to track the language related to retreat in HRS §

703-305(2). However, the instruction retained the language on

provocation as follows:

> The use of deadly force is not justifiable if the defendant, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter.
>         . . . When, under the law of justification based upon self-defense, the defendant would've been obliged to retreat or comply with a demand before using deadly force, he is not obliged to do so before using deadly force to protect another person unless he knows that he can thereby secure the complete safety of the third person.
>         When, under the law of justification based upon self-defense, the person whom the defendant seeks to protect would be obliged to retreat or comply with a demand before using deadly force if that person knew that he or she could obtain complete safety by doing so, the defendant is obliged to try to cause the person to do so before using deadly force in the person's protection if the defendant knows that he can obtain the other's complete safety in that way.

(Emphases added.)

Petitioner does not claim that the language related to

retreat in the court's protection of others instruction in the

second trial was erroneous, and indeed, the ICA stated that

"[Petitioner] appears to concede that this modified instruction

resolves his objection to the language regarding the duty to

retreat in paragraph 7 of the instructions given in the first

trial." Mark, 120 Hawai'i at 528, 210 P.3d at 51. Because the

language related to retreat in this instruction tracks the

language in HRS § 703-305(2), this portion of the instruction was

an accurate statement of the law.

However, the instruction continued to contain the same

erroneous language related to provocation by Petitioner as in

clause (a) of paragraph 7 in Jury Instruction No. 65.  The ICA

"agree[d] with [Petitioner] on that point," but held that the

error was harmless beyond a reasonable doubt because

> [t]he jury was instructed with regard to self-defense in the
> second trial, and implicitly rejected that defense by
> convicting [Petitioner] of the attempted first degree
> assault of Officer Sung.  Although there were some
> differences in the evidence between the two trials,
> nevertheless there was no evidence establishing that
> [Petitioner] reasonably believed that Martin or Daughter
> would have been justified in using deadly force to protect
> themselves inside [] Baskin-Robbins.

Id. (footnote omitted).  With this statement, the ICA implied

that because the jury "implicitly rejected" the defense of self-

defense, the defense of others defense was therefore unavailable

to Petitioner.  However, as discussed above, this conclusion by

the ICA was wrong because the commentary to HRS § 703-305

specifically provides that a defendant may be justified in using

force to protect another person, even if the defendant himself or

herself was not justified in using force for self protection.

The only apparent difference in the evidence between

the two trials was that at his second trial, Petitioner testified

that he was "worried" about Martin in Baskin Robbins because she

was pregnant.  Petitioner had not mentioned being "worried" about

Martin during his first trial.  Petitioner's testimony at his

second trial that he was "worried" about Martin does not alter

the conclusion reached above in regard to the court's instruction

on protection of others.

There was no evidence adduced at Petitioner's second

trial that would have given rise to a reasonable belief that

Martin would have been justified in using deadly force to protect herself. The testimony in regard to the actions of the officers was the same, in that they grabbed for Petitioner, and did not threaten Martin or Daughter in any way. Therefore, as with clause (a) of paragraph 7 in Jury Instruction No. 65, Petitioner was not prejudiced by the language related to provocation in the instruction on protection of others in his second trial.

G.

Related to Petitioner's claim of erroneous jury instructions, Petitioner also argues in a footnote in his Application that "[i]n [his] Reply Brief, [Petitioner] raised an additional issue regarding the [court's] failure to give a complete definition of Kidnapping. [Petitioner] would again renew the request to consider this as plain error." Petitioner makes no further argument regarding this issue in his Application.

In his Reply Brief, Petitioner stated that, during his first trial, he testified that he thought the men "were robbing the Baskin Robbins store" and that, in his second trial, he testified that "[t]hese guys go take my money." Petitioner stated that "theft of property from the person of another is a Class C felony," and HRS § 707-720 (1993) with respect to kidnapping states that

> [a] person commits the offense of kidnapping if the person
> intentionally or knowingly restrains another person with
> intent to:
>     . . . .

(c)  Facilitate the commission of a felony or flight thereafter;
(d)  Inflict bodily injury upon that person or subject that person to a sexual offense; [or]
(e)  Terrorize that person or a third person[.]

(Emphasis added.)

Petitioner stated that "[i]n his case, for both trials, the court gave the following definition of kidnapping, which covered only [HRS § 707-720(d) and HRS § 707-720(e)]: "'A person commits kidnapping if he intentionally or knowingly restrains another person with intent to inflict bodily injury upon that person or terrorize that person.'" Petitioner argued that the court's instruction was plainly erroneous because the instruction did not cover HRS § 707-720(c) relating to the commission of a felony.

It does not appear that the ICA addressed Petitioner's argument regarding an allegedly erroneous definition of kidnapping, nor did Respondent address this issue in its memorandum in opposition. Petitioner did not object to the court's kidnapping instruction at trial. Additionally, Petitioner acknowledged in his Reply Brief that "[t]his specific argument was not raised as a point of error in the opening brief." Thus, we are not obligated to address Petitioner's argument regarding the court's purportedly erroneous kidnapping instruction. See In re Hawaiian Flour Mills, Inc., 76 Hawai'i 1, 14 n.5, 868 P.2d 419, 432 n.5 (1994) (holding that arguments raised for the first time in the reply briefs on appeal were

deemed waived) (citation omitted); Hawai'i Rules of Appellate Procedure Rule 28(d) (2005) (providing that "[t]he reply brief shall be confined to matters presented in the answering brief").

However, because Petitioner's assertion relates to jury instructions, whether the court's instruction was plain error is briefly discussed. See State v. Nichols, 111 Hawai'i 327, 335, 141 P.3d 974, 982 (2006) (holding that the plain error and harmless error standards of review merge in the case of jury instructions, because "the duty to properly instruct the jury lies with the trial court[,]" and, thus, "the same standard of review is to be applied both in cases in which a timely objection to a jury instruction was made and those in which no timely objection was made"). In the case of jury instructions, "once instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, i.e., that the erroneous jury instruction was not harmless beyond a reasonable doubt." Id. at 337, 141 P.3d at 984 (emphasis added). The questions to be addressed, then, are (1) whether there was instructional error and (2) whether any such error was harmless.

Again, as to whether instructional error occurred, "[w]hen jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially

insufficient, erroneous, inconsistent, or misleading." State v. Gonsalves, 108 Hawai'i 289, 292, 119 P.3d 597, 600 (2005) (internal quotation marks and citation omitted) (emphasis added). In this case, it does not appear that any prejudice resulted from the court's instructions. Petitioner's theory is that, based on his statement in the second trial that "[t]hese guys go take my money[,]"[29] there is a reasonable possibility that the jury might have concluded that Petitioner was justified in using deadly force in order to prevent a kidnapping, because he believed the officers were "intentionally or knowingly restrain[ing] another person with intent to . . . [f]acilitate the commission of a felony[,]" i.e., theft. However, based only on the lone statement of "taking my money," there would not be a reasonable possibility that any potential error regarding the kidnapping instruction might have contributed to Petitioner's conviction, and thus, his argument that this court should recognize plain error must be rejected.

---

[29] The testimony upon which Petitioner relies was as follows:

> [DEFENSE COUNSEL] Q.  -- that they were reaching around your pocket area?
> [PETITIONER] A.  They was reaching in my pockets.
> Q.  And, what -- when they reached in your pockets, what did you think?
> A.  These guys go take my money.

Petitioner does not point to any testimony or other evidence indicating his actions against the officers were taken because he believed they were going to steal his money.

V.

A.

1.

As to his second question, Petitioner maintains in his Application that the "[c]oncurrent representation of Piko and [Petitioner] should have led to imputed disqualification of the [OPD] requiring a mistrial and appointment of new counsel." Petitioner asserts that the OPD represented Piko "from 2001 to 2002[, t]he OPD continued its representation of Piko in April of 2004[,]" and that "[d]uring this time, the OPD was also representing [Petitioner] during his two trials starting from March of 2003." According to Petitioner, DPD Ho "testified that within the OPD, there was 'free sharing of information.' . . . There was no screening procedure to prevent [DPDs] from discussing client confidences with other [DPDs]."

Petitioner avers that the OPD was required to find evidence to impeach Piko, including evidence in the OPD's files, and the fact that it "supposedly did not discover [the] conflict until July of 2004 would indicate that [it] placed Piko's confidentiality above [Petitioner's] need for the evidence. Additionally, Petitioner argues that "the ICA never directly addressed the defense's assertion that, if a public defender's office is to be treated as a private law firm rather than a government office, then there should be an imputed disqualification for all the attorneys in the office." He claims

that "[o]ther jurisdictions have found that any confidential information obtained by a public defender from a client must be imputed to other members of the public defender's staff."

2.

Respondent disagrees, claiming that Hawai'i Rules of Professional Conduct (HRPC) Rule 1.7[30] and Rule 1.9[31] "do not require after-the-fact disqualification." Respondent relies entirely on the ICA's holding on this issue, discussed further infra, in support of its conclusion that "Petitioner's accusation does not constitute a basis to grant his Application."

3.

The ICA "assume[d,] arguendo that OPD was one 'firm within the meaning of HRPC Rule 1.10"[32] and determined "that [Piko] was a former client of OPD in July 2004." Mark, 120 Hawai'i at 532-33, 210 P.3d at 55-56 (emphasis added). The ICA concluded that (1) "[c]ourts from other jurisdictions have found no conflict of interest based on defense counsel's prior representation of a witness, when the witness had already been sentenced before the commencement of trial[,]" (2) "[t]he conclusion that Rule 1.9 governs here is also consistent with Richie[,]" (3) "[t]he [court] properly determined that the denial of [Petitioner's Motion] would not result in a violation of Rule

---

[30] See discussion of HRPC Rule 1.7 infra.

[31] See discussion of HRPC Rule 1.9 infra.

[32] See discussion of HRPC Rule 1.10 infra.

1.9(c)[,]" and (4) "there is nothing in the record establishing that there was any adverse effect on [Loy's] actual performance at trial." Id. at 534-35, 210 P.3d at 56-58. The ICA held that the court "did not abuse its discretion in denying the motions[.]" Id. at 535, 210 P.3d at 58.

In regard to Petitioner's contention that Petitioner's Motion "should have been granted" because "the OPD was representing both Piko and [Petitioner] concurrently in April 2004, when Piko's probation was being revoked and [Petitioner] was waiting for his second trial to begin[,]" the ICA concluded that "[i]t is undisputed that the OPD was unaware of that concurrent representation when it was occurring, and thus it had no effect on the representation of either client at that time." Id. The ICA held that "[i]n the circumstances of this case, Rules 1.7 and 1.9 do not require after-the-fact disqualification." Id.

B.

This court granted the OPD leave to file an Amicus Curiae brief (Amicus) with respect to the specific issue of "(1) how the [ICA's] May 8, 2009 opinion on the issue of conflicts of interest affects the interests of the OPD; and (2) how the May 8, 2009 opinion impacts the OPD's criteria to determine whether a conflict of interest exists." This court ordered Respondent to file a response to the Amicus brief (Response to Amicus).

61

C.

1.

HRPC Rule 1.7 sets forth the standard for when a conflict arises in the context of <u>concurrent</u> representation of multiple clients:

> **Rule 1.7. CONFLICT OF INTEREST: GENERAL RULE.**
> (a) <u>A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless</u>:
>    (1) the lawyer reasonably believes the representation will not <u>adversely affect</u> the relationship with the other client; <u>and</u>
>    (2) each client <u>consents</u> after consultation.
> (b) <u>A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client</u> or to a third person, or by the lawyer's own interests, unless:
>    (1) the lawyer reasonably believes the representation will not be adversely affected; and
>    (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

(Emphases added.) Thus, under the rules, a lawyer may not concurrently represent a client if such representation is "directly adverse" to another client, or if representation might be jeopardized by obligations arising out of representation of another client.

With regard to a lawyer's obligations of loyalty to his or her client, Comments 3 and 4 to HRPC Rule 1.7 provides that:

> [3] As a general proposition, loyalty to a client prohibits undertaking representation directly adverse to that client without that client's consent. Paragraph (a) expresses that general rule. Thus, <u>a lawyer ordinarily may not act as advocate against a person the lawyer represents in some other matter, even if it is wholly unrelated</u>. On the other hand, simultaneous representation in unrelated matters of clients whose interests are only generally adverse, such as competing economic enterprises, does not require consent of the respective clients. <u>Paragraph (a) applies only when the representation of one client would be</u>

directly adverse to the other.
　　[4]　Loyalty to a client is also impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests. The conflict in effect forecloses alternatives that would otherwise be available to the client. Paragraph (b) addresses such situations. A possible conflict does not itself preclude the representation. The critical questions are the likelihood that a conflict will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client. Consideration should be given to whether the client wishes to accommodate the other interest involved.

(Emphases added.) Regarding conflicts that arise in the context of litigation, the Commentary states in relevant part:

　　Paragraph (a) prohibits representation of opposing parties in litigation. Simultaneous representation of parties whose interests in litigation may conflict, such as co-plaintiffs or co-defendants, is governed by paragraph (b). An impermissible conflict may exist by reason of substantial discrepancy in the parties' testimony, incompatibility in positions in relation to an opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question. Such conflicts can arise in criminal cases as well as civil. The potential for conflict of interest in representing multiple defendants in a criminal case is so grave that ordinarily a lawyer should decline to represent more than one co-defendant. On the other hand, common representation of persons having similar interests is proper if the risk of adverse effect is minimal and the requirements of paragraph (b) are met. . . . .

Comment 7 to HRPC Rule 1.7 (emphases added).

　　HRPC Rule 1.9 sets forth the standard for adjudging whether a conflict is present in the context of former representation:

**Rule 1.9.　CONFLICT OF INTEREST: FORMER CLIENT.**
　　(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.
　　(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client

        (1) whose interests are materially adverse to that person; and

        (2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client consents after consultation.

        (c) <u>A lawyer who has formerly represented a client in a matter</u> or whose present or former firm has formerly represented a client in a matter <u>shall not thereafter</u>:

        (1) <u>use information relating to the representation to the disadvantage of the former client</u> except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client, or <u>when the information has become generally known</u>; or

        (2) <u>reveal information relating to the representation</u> except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client.[33]

(Emphases added.)

## 2.

In <u>Richie</u>, this court set forth the standard for determining when a conflict arises amounting to ineffective assistance of counsel under the Hawai'i Constitution, based on the federal standard as well as HRPC Rule 1.7. <u>Richie</u>, 88 Hawai'i at 44, 960 P.2d at 1252. This court first noted that, under federal law,

> the defendant must demonstrate that his attorney <u>actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance</u>. As noted above, <u>proof of actual prejudice is not required</u>. Furthermore, <u>a defendant may knowingly, intelligently, and voluntarily waive his right to conflict-free representation</u>.

---

[33] HRPC Rule 1.6 outlines certain instances wherein an attorney is permitted or mandated to reveal information relating to representation. The rule allows "for disclosures that are impliedly authorized in order to carry out the representation" and further permits the attorney to reveal information to prevent criminal activity under certain circumstances, or to defend the attorney in a suit brought by the client. The rule further mandates disclosure of "information which clearly establishes a criminal or fraudulent act of the client in the furtherance of which the lawyer's services had been used[.]"

HRPC Rule 3.3 prohibits an attorney from providing false information to the court, and places an obligation on the attorney to disclose information to the court "when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client[.]"

Id. (internal quotation marks and citations omitted) (emphases added). Thus, Richie explained that, based on HRPC Rule 1.7 and federal law, three factors are relevant in determining whether a conflict rises to the level of ineffective assistance: "The first factor is whether a relationship existed between the attorney and his/her clients giving rise to a conflict. The second factor is whether the relationship had an adverse effect on counsel's performance. And the third factor is whether counsel obtained the consent of his/her clients." Id. (emphases added). However, in formulating the Hawai'i standard, this court did not require that all three factors be present in order for assistance to be ineffective, but that there must be "(1) a relationship giving rise to a conflict of interest . . . between defense counsel and his/her clients; and (2) either the relationship adversely affected defense counsel's performance, or the client did not consent to the relationship." Id. (emphases added). Thus, where there is a "relationship giving rise to a conflict" and absence of consent, assistance will be considered constitutionally ineffective. As to what types of relationships "giv[e] rise" to a conflict, this court listed as "[e]xamples," "joint representation of two or more co-defendants and [pertinent to this case] concurrent representation of both the defendant and . . . . a prosecution witness." Id. (emphasis added).

3.

The court determined, and the ICA affirmed, that in this case, OPD's representation of Piko was "former" representation, and not concurrent representation of both Petitioner, i.e., the defendant, and Piko, i.e., a prosecution witness. Mark, 120 Hawai'i at 533, 210 P.3d at 56. Thus, the standard set forth in Rule 1.9, and not Rule 1.7, was applicable. Although Richie did not deal with former representation under Rule 1.9, but only with concurrent representation under Rule 1.7, the standard set forth therein should be applicable in either context, inasmuch as both pertain to conflicts of interest. However, different standards for what constitutes a "relationship giving rise to a conflict" govern depending on which rule is applied. See Fragiao v. State, 95 Hawai'i 9, 18, 18 P.3d 871, 880 (2001) ("To determine whether a relationship giving rise to a conflict of interest existed, we turn to the HRPC for guidance. Satisfaction of the first prong of the Richie test depends on whether the relevant HRPC provisions would prohibit [the attorney] from representing [the client].") (Citation omitted.) (Emphasis added.)

Thus, while under Rule 1.7, the status of the clients as "defendant" and "prosecution witness" alone would constitute a relationship giving rise to a conflict where there is concurrent representation, under Rule 1.9, subsequent representation of another client would be permissible so long as it is not in the

context of "the same or a substantially related matter" and the lawyer refrains from "us[ing] information relating to the representation to the disadvantage of the former client except . . . when the information has become generally known; or [] reveal[ing] information relating to the representation[.]" Thus, first it must be determined whether the court or the ICA erred in concluding that OPD's representation of Piko was "former" representation as opposed to "concurrent."

4.

As recognized by the ICA,

> Rule 1.9 does not define what it means for an attorney to have "formerly" represented a client. The comment to the rule notes only that "[a]fter termination of a client-lawyer relationship, a lawyer may not represent another client except in conformity with this rule." The [American Bar Association's (ABA)] Annotated Model Rules of Professional Conduct (5th ed. 2003) ("Annotated Model Rules") notes that "[t]here is no per se rule regarding when a client becomes a former client." Annotated Model Rules at 173.

Mark, 120 Hawai'i at 533, 210 P.3d at 56 (emphasis added).

Comments 1 and 2 to Rule 1.9 further states:

> [1] After termination of a client-lawyer relationship, a lawyer may not represent another client except in conformity with this rule. The principles in Rule 1.7 determine whether the interests of the present and former client are adverse. Thus, a lawyer could not properly seek to rescind on behalf of a new client a contract drafted on behalf of the former client. So also a lawyer who has prosecuted an accused person could not properly represent the accused in a subsequent civil action against the government concerning the same transaction.
> [2] The scope of a "matter" for purposes of this rule may depend on the facts of a particular situation or transaction. The lawyer's involvement in a matter can also be a question of degree. When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests clearly is prohibited. On the other hand, a lawyer who recurrently handled a type of problem for a former client is not necessarily precluded from later representing another client in a wholly distinct problem of that type even though the subsequent representation involves

a position adverse to the prior client.  Similar considerations can apply to the reassignment of military lawyers between defense and prosecution functions within the same military jurisdiction.  The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question.

(Emphases added.)  Thus, subsequent representation is prohibited where the subsequent client's interests are adverse to the former client with regard to "the same transaction."

The ICA, like the court, "conclude[d] that [Piko] was a former client of OPD in July 2004[,]" because "Piko's probation violation had been adjudicated and Piko had been re-sentenced to a new term of probation in April 2004, approximately three months before the second trial."  Mark, 120 Hawai'i at 533, 210 P.3d at 56.  The ICA further deemed relevant that

> [t]he [court] found in [finding] 4 that the OPD did not "have any matters pending with regard to Piko" in July 2004 and had closed [its] file, and there is substantial evidence to support that finding.  OPD's closing of the file implies that it understood that it would not be called upon to use the file again, absent some unforeseen future event.  The mere possibility that such an event could occur is insufficient to convert what would otherwise be former representation into concurrent representation for the purposes of the HRPC.  Moreover, there is nothing in the record indicating that Piko had any understanding that his representation by OPD was ongoing after his re-sentencing in April 2004.

Id.

The court, in determining that no conflict existed based on OPD's "former" representation of Piko, made the following relevant findings and conclusions:

FINDINGS OF FACT

1. [Ho] testified that [Piko] previously had been represented by [Burks] of [OPD].
2. [Burks] previously represented Piko in a matter that resulted in him being placed on his current probation.

68

3. Piko has never waived his attorney-client privilege.

4. Neither [Burks] nor the [OPD] have any matters pending with regard to Piko and the [OPD] has closed his file.

5. Ho had never assigned either [Loy] or [Marshall] to handle any matters regarding Piko.

6. Piko's files, which came in existence during his relationship with [Burks], are in Ho's office and if instructed by the court he would not allow anyone access to the files.

7. Ho had no knowledge of either [Loy] or [Marshall] having gained access to Piko's files or having learned of any confidential attorney-client communications had between Piko and [Burks].

8. [Loy] had not learned of any secrets of Piko nor did she have knowledge of any confidential attorney-client communications had between Piko and [Burks].

9. [Loy] informed the court that she had never worked on Piko's case.

10. Piko's conviction for forgery and his status as a probationer are matters of public record, which [OPD] could acquire.

11. [Petitioner's] trial does not involve either the same or any matter substantially related to the facts and circumstances regarding the case in which Piko was placed on probation.

12. [OPD] never represented Piko for any matter related to the alleged parking lot shooting for which [Petitioner] is currently standing trial.

13. Piko's prior case with [OPD] is completely unrelated to any of the circumstances in the instant trial involving Defendant.

14. [Loy] represented to the court that she intended to call Piko as her own witness.

15. [Loy] informed the court that Piko's testimony would benefit the defense theory, notwithstanding the possibility that he might be subject to impeachment with his forgery conviction and his current status as a probationer in the event he does not testify in accordance with the testimony he gave during [Petitioner's] prior trial and other statements he made.

16. [Loy's] ability to represent zealously the interests of [Petitioner] will not be affected by Piko's status as former client of [OPD].

17. [Loy] did not identify any limitation on her ability to represent zealously [Petitioner] due to [Burks'] prior representation of Piko.

. . . .

22. Neither [Loy] nor [Marshall] will attempt to gain access to confidential attorney-client files of Piko created as a result of [Burks'] representation of him or knowledge of any confidential attorney-client communications had between them.

23. In order to ensure and prevent any conflicts of interest, [OPD] is disqualified immediately from representing [Piko] in any matter here on.

CONCLUSIONS OF LAW

1. Based upon the evidence the court found credible, and the representations of counsel, there is no basis to conclude that confidential attorney-client communications had between [Burks] and Piko will be communicated to either [Loy] or [Marshall].

. . . . [34]

3. Because nothing currently is pending with regard to [Piko] and [OPD] considers his case closed, his relationship with [OPD] is not concurrent. Piko's status is that of a prior or former client for purposes of conflict analysis.

4. Piko's status as a former or prior client makes [Richie] distinguishable from the situation in the instant matter, because the case dealt with one defense lawyer concurrently representing the defendant and a key state witness, creating a clearly, inherently, and directly adverse conflict. Whereas, in the instant matter, neither [Loy] nor [Marshall] ever represented Piko, and only [Petitioner], not Piko, is a current client of [OPD].

5. Pursuant to [HRPC Rule 1.9], a lawyer who formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests (to wit those of [Petitioner]) are materially adverse to the interests of the former client unless the former client consents after consultation.

6. The commentary to [HRPC Rule 1.9] notes that the principles of [HRPC Rule 1.7] determine whether the interests of the present and former client are adverse.

7. Neither [Loy] nor [Marshall] are acting as an advocate against [Petitioner], whom they currently represent, thus there is no violation of [HRPC Rule 1.7].

8. Inasmuch as neither [Loy] nor [Marshall] ever represented Piko, and there being no evidence of any relationship that exists or existed between him and [Loy] or [Marshall], counsels' ability to represent [Petititioner] will not be materially limited due to [Burks'] prior representation of Piko.

9. There has been no showing of any specific material limitation that will arise in [Loy's] representation of [Petitioner] based upon [Burks'] prior representation of Piko.

10. Piko's conviction for forgery and his status as a probationer are public record and not matters of confidential attorney-client communications.

11. [Loy] will be allowed to adduce evidence regarding Piko's conviction for forgery and his status as a probationer, as such information is public record and the prosecution has so acknowledged and agreed to its admissibility.

12. Neither [Loy's] nor [Marshall's] duties and responsibilities to [Petitioner] require that they attempt to gain access to Piko's confidential attorney-client files that came into existence as a result of [Burks'] representation of him.

---

34    Conclusion 2, which indicated that OPD is "more akin to a law firm than a government office[,]" was deleted by the court.

13. Neither [Loy's] nor [Marshall's] duties or responsibilities to [Petitioner] require that they attempt to gain knowledge of confidential attorney-client communications had between Piko and [Burks].
14. [Loy's], as well as [Marshall's] loyalty to [Petitioner] is undivided and will not be affected adversely by [Burks'] prior represenation of Piko.
15. Neither [Loy] nor [Marshall] has a duty of loyalty to Piko resulting from [Burks'] prior representation of him.
16. The inadmissibility of evidence regarding any confidential attorney-client communications had between Piko and [Burks] . . . is based upon the attorney-client privilege and as such does not demonstrate [Loy's] lack of loyalty or ability to represent effectively [Petitioner].
. . .
17. Neither [Loy's] nor [Marshall's] representation of [Petitioner] is directly adverse to [Burks'] prior representation of Piko.
18. [Burks'] prior representation of Piko is not directly adverse to either [Loy's] or [Marshall's] representation of [Petitioner].

(Emphases added.)[35] Manifestly, then, the court concluded that OPD's representation of Piko was prior, as opposed to concurrent, to its representation of Petitioner, making Rule 1.9 applicable.

The court determined that there was no conflict under Rule 1.9, because OPD's subsequent representation of Petitioner was not "in the same or a substantially related matter in which [Petitioner's] interests are materially adverse to the interests of the former client," inasmuch as Piko's previous forgery charge was entirely unrelated to the events leading to the charges against Petitioner, and Petitioner's interests were not adverse

---

[35] Although the court did not state upon what it based the finding that OPD is more akin to a private firm, OPD argues that there was "substantial evidence in the record to support the circuit court's finding[,]" such as the sharing of confidential information, the use of file storage facilities accessible to all DPDs, DPDs "standing in" for other DPDs at trial and hearings when it is required, and the agency relationship of public defenders to the State Public Defender. However, as discussed infra, these facts are not applicable inasmuch as Piko was a former client at the time he gave his testimony and the subsequent representation of Petitioner was manifestly not part of "the same or a substantially related matter[.]" HRPC Rule 1.9.

to Piko's as to the forgery charge but only with regard to a completely distinct matter. Furthermore, the court concluded there was no evidence that Loy or Marshall would "use information relating to the representation to the disadvantage of the former client except . . . information [that] has become generally known[,]" i.e., Piko's prior conviction, or "reveal information relating to the representation[.]" See HRPC Rule 1.9.[36]

D.

1.

Despite the fact that OPD's representation of Piko could have been properly considered former after April 2004, and, indeed, after the July 2004 hearing in which the court precluded OPD from further representation of Piko in any context, plainly, there was a period of concurrent representation prior to the

---

[36] With regard to confidentiality, Comment 6 to Rule 1.9 provides as follows:

> [6] Preserving confidentiality is a question of access to information. Access to information, in turn, is essentially a question of fact in particular circumstances, aided by inferences, deductions or working presumptions that reasonably may be made about the way in which lawyers work together. A lawyer may have general access to files of all clients of a law firm and may regularly participate in discussions of their affairs; it should be inferred that such a lawyer in fact is privy to all information about all the firm's clients. In contrast, another lawyer may have access to the files of only a limited number of clients and participate in discussions of the affairs of no other clients; in the absence of information to the contrary, it should be inferred that such a lawyer in fact is privy to information about the clients actually served but not those of other clients.

(Emphasis added.) The court's findings indicate that, based on the specific facts of this case, Petitioner's attorneys' access to the files regarding OPD's former representation of Piko was limited. Upon this record, it does not appear that those findings were clearly erroneous.

second trial. As noted by the ICA, "Ho testified that in his opinion, [OPD's] representation of Piko and [Petitioner] was concurrent because while the office 'was active with [Petitioner's] case, [Piko] came back on a probation revocation and then [OPD] represented both defendants at the same time.'" Mark, 120 Hawai'i at 529, 210 P.3d at 52. Thus, there was a period of concurrent representation.

The ICA rejected Petitioner's assertion that the previous period of concurrent representation created a conflict. The ICA noted Petitioner's argument that

> even if [OPD] was not concurrently representing [Petitioner] and Piko at the time of [Petitioner's] second trial in July 2004, the motions should have been granted based on the fact that [OPD] was representing both Piko and [Petitioner] concurrently in April 2004, when Piko's probation was being revoked and [Petitioner] was waiting for his second trial to begin.

Id. at 535, 210 P.3d at 58 (emphasis added). However, the ICA "reject[ed] this argument" because "[i]t is undisputed that [OPD] was unaware of that concurrent representation when it was occurring, and thus, it had no effect on the representation of either client at that time. In the circumstances of this case, Rules 1.7 and 1.9 do not require after-the-fact disqualification." Id. (citation omitted). The ICA noted that "we do not mean to suggest that a lawyer will always avoid disqualification in circumstances where the lawyer was unaware of a potential conflict." Id. at 536 n.27, 210 P.3d at 59 n.27.

While that point is cogent, especially with regard to a single lawyer whose multiple representation gives rise to a

conflict, it is worth noting that, with respect to attorneys working for a law firm, Rule 1.10 is also relevant, requiring that "[w]hile lawyers are associated in a firm, none of them shall <u>knowingly</u> represent a client when any one of them practicing alone would be prohibited from doing so[.]" (Emphasis added.) Clearly, Loy's and Burks' representation of Petitioner and Piko, respectively, in April 2004, was not "knowing" as to representation by the other and, thus, would not directly violate Rule 1.10.

## 2.

Although not precisely on point, <u>Richie</u> is instructive in determining, in the case of either prior or concurrent representation, whether at a given point in time, the nature of the attorney-client relationship is one that gives rise to a conflict. Although the ICA discussed the facts of <u>Richie</u> as being supportive of its conclusion, it is unclear how the ICA applied <u>Richie</u>. With regard to the facts of <u>Richie</u>, the ICA stated that

> <u>[t]he conclusion that Rule 1.9 governs here is also</u> <u>consistent with</u> <u>*Richie*</u>. The defendant in <u>Richie</u> was convicted of promoting prostitution, after he had been paid to provide several women to perform as exotic dancers at a bachelor party. One of those women, Monica Alves [(Alves)], had been a codefendant in the case, but the charges against her had been dismissed by the time of Richie's trial. Richie was represented at trial by two attorneys. On appeal, Richie asserted "that the performance of his trial counsel was constitutionally ineffective based on a conflict of interest" where "one of his trial attorneys was representing [] Alves in a civil suit at the same time the attorney was representing Richie in the present case."
> The supreme court concluded that while trial counsel's decision to represent Alves in the civil case was "at the very least, unwise, under the particular circumstances of this case, we do not believe that trial counsel's

relationship with his clients was sufficient to give rise to a conflict of interest." The court observed that (1) by the time Richie's trial began, the charges against Alves had been dismissed, and Alves was no longer a codefendant in Richie's case; (2) although Alves was a potential prosecution witness, she was not actually called to testify; and (3) that Richie "was represented by two attorneys at trial, and only one of those was involved in Alves's civil suit."

In sum, <u>Richie</u> involved potential concurrent representation. The supreme court expressly noted that "prior representation is not at issue in the present case." <u>Thus, while *Richie* is instructive with regard to the supreme court's application of HRPC Rule 1.7, it is consistent with our conclusion that the circuit court properly determined that Rule 1.9, rather than Rule 1.7, governed the situation here</u>.

<u>Mark</u>, 120 Hawai'i at 534, 210 P.3d at 57 (emphases added) (internal citation, ellipsis, and brackets omitted). It is not evident from the ICA's discussion how <u>Richie</u> "is consistent with [the] conclusion" that Rule 1.9 should apply. It is necessary that the ICA's discussion on this point be clarified.

As noted above, in <u>Richie,</u> one of the defendant's trial attorneys represented Alves, a former co-defendant and potential prosecution witness, in a civil suit at the same time the attorney was representing Richie. 88 Hawai'i at 41, 960 P.2d at 1249. This court concluded that there was no conflict due to concurrent representation in that case, based on the following:

First, <u>it is apparently undisputed that trial counsel represented both Richie in the present case and Alves in a separate civil case. Inasmuch as Alves was an obvious potential witness in the present case, trial counsel's decision to represent Alves in the civil case was, at the very least, unwise</u>. However, based on the particular circumstances of the present case, we do not believe that trial counsel's relationship with Richie and Alves supports an ineffective assistance of counsel claim. <u>By the time Richie went to trial, the charges against Alves had been dismissed; therefore, she was no longer a co-defendant in the present case. Furthermore, Alves was never actually called as a witness in this case. Although she was clearly a potential witness, she was not an actual witness. Therefore, Alves was neither a co-defendant nor a prosecution witness in Richie's trial</u>. Moreover, Richie was

> represented by two attorneys at trial, and it appears that only one of these attorneys was involved in Alves's civil suit. <u>Consequently, under the particular circumstances of this case, we do not believe that trial counsel's relationship with his clients was sufficient to give rise to a conflict of interest</u>.

<u>Id.</u> at 44, 960 P.2d at 1252 (some emphases in original and some added) (emphasis omitted).

Hence, <u>Richie</u> indicates that, although a "relationship giving rise to a conflict" may exist at a certain point in time, <u>i.e.</u>, prior to trial, if that relationship ceases prior to the development of an actual conflict, then counsel is not necessarily ineffective, depending on the "particular circumstances of the [] case[.]" <u>See</u> <u>id.</u> In <u>Richie</u>, it appears that, at some point prior to trial, Alves was both a co-defendant and a potential witness, and thus, concurrent representation would have given rise to a conflict at that time; however, <u>Richie</u> relied on the fact that "[<u>b</u>]<u>y the time Richie went to trial</u>, . . . [Alves] was no longer a co-defendant" and she did not appear as a prosecution witness. <u>Id.</u> (emphasis added). Thus, under the particular circumstances of that case, no conflict materialized.

### 3.

Similarly, here, prior to Petitioner's second trial, when Piko's case was re-opened due to a violation of his probation, OPD concurrently represented Piko and Petitioner for a period of time when Piko was a potential prosecution witness. During that particular time period, a "relationship giving rise

to a conflict" potentially existed between OPD, Piko, and Petitioner. OPD maintains that "the ICA placed too much reliance on the fact that Piko's physical file had been closed [and] was stored in a room designated for closed files." According to OPD, the practice of when a file should be closed varies from attorney to attorney and, as such, should not be a measure for when representation has ended.[37]

However, "[b]y the time [Petitioner] went to trial" in the second trial, Piko's case file was closed, and OPD was no longer actively representing Piko. Furthermore, if any question remained as to whether OPD still held any responsibilities with regard to Piko, the court officially terminated any future OPD representation of Piko at the July 2004 hearing, prior to the time when Petitioner called Piko as an adverse witness.[38] Thus, at the time Loy engaged in her cross-examination of Piko at trial, there is no question that OPD's representation of Piko had ceased. As explained supra, HRPC Rule 1.9, subsequent representation of another client (in this case, Petitioner,) is permissible so long as it is not in the context of "the same or a

---

[37]  OPD asserts that "[r]epresentation does not cease when a defendant is sentenced to a probationary term. Representation continues while defendant is on probation." OPD claims that "every new case [that] is initiated by complaint, information or indictment, is assigned a new criminal number," but no new numbers are assigned and "reappointment is not necessary [post-sentencing] because the attorney who represented the defendant at sentencing continues to represent the defendant on post-sentencing matters." However, OPD does not explain how this would prevent it from implementing effective screening procedures to avoid potential conflicts.

[38]  Piko was not called by the prosecution.

substantially related matter" and counsel refrains from using the information obtained through that prior representation to the detriment of the former client. Here, it is evident that Loy did not access or use information in Piko's file.

4.

For the reasons stated above, and based on the particular circumstances of this case, the ICA did not gravely err in concluding that the court did not abuse its discretion by applying the standard for "former" representation under Rule 1.9 in denying Petitioner's motion for mistrial. The proceedings in which OPD represented Petitioner were not "the same or [] substantially related" to those in which it previously represented Piko, and there was no evidence that OPD would "use . . . or [] reveal [confidential] information relating to the representation" of Piko, and, instead, substantial evidence was presented that OPD would not use any information obtained by virtue of its previous representation of Piko.[39] See Mark, 120 Hawai'i at 530, 210 P.3d at 53.

---

[39] OPD argues that, "[i]f the motion [to withdraw] would have been granted prior to the commencement of trial, the same motion should be granted during trial, especially prior to the cross-examination of OPD client/witness." It asserts that if a motion to withdraw had been made at the time of the concurrent representation, it should have been granted. In its response to OPD's amicus brief, Respondent argues that, "[n]otwithstanding OPD counsel's assertion, the 'timing of the motion' must matter because a court cannot be expected to act until the matter is brought to the attention of the court or a disqualifying conflict of interest is readily apparent from the proceedings." Respondent is correct insofar as the potential for conflict in this case was resolved as indicated. Moreover, as Respondent correctly stated, many conflicts may be avoided if OPD follows the advice of the ICA, which "emphasize[d] the importance of having effective procedures in place to timely identify potential conflicts before representation is undertaken." (Citing Mark, 120 Hawai'i at 536 n.27, 210 P.3d at 59 n.27).

5.

Although the ICA did not gravely err in its conclusion that the court's decision was not an abuse of discretion, it is necessary to correct the ICA's opinion, inasmuch as it based its decision in part on its conclusion that there was no "adverse effect on [counsel's] actual performance at trial[,]" Mark, 120 Hawai'i at 535, 210 P.3d at 58, thereby indicating that the effect on counsel's performance is a necessary consideration, even in cases where no consent has been given as in this case. Such a view represents an unwarranted departure from Richie.

As stated supra, Richie held that representation is constitutionally ineffective where there exists "(1) a relationship giving rise to a conflict of interest . . . between defense counsel and his/her clients; and (2) either the relationship adversely affected defense counsel's performance, or the client did not consent to the relationship." Richie, 88 Hawai'i at 44, 960 P.2d at 1252 (emphases added). Thus, where no consent is given, the defendant need not show any adverse affect on counsel's performance.

Petitioner claims that "it is undisputed that neither [Petitioner] nor Piko consented to any conflict of interest." Respondent does not dispute this claim. Under Richie, absent consent, the only remaining question as to whether counsel was ineffective is whether there was a "relationship giving rise to a conflict[,]" regardless of counsel's actual performance. See id.

Moreover, Richie emphasized that no showing of "actual prejudice" is required, i.e., a showing that there is a reasonable possibility that the result of the proceeding might have been different. Id. at 42, 960 P.2d at 1250. In that regard, Richie adopted the rationale of the federal courts that "proof of actual prejudice is not required because 'prejudice is presumed when counsel is burdened by an actual conflict of interest.'" Id. at 42-43, 960 P.2d at 1250-51 (quoting Strickland v. Washington, 466 U.S. 668, 692 (1984)).

In spite of the holding in Richie, the ICA based its decision in part on its determination that

> there is nothing in the record establishing that there was any adverse effect on [Loy's] actual performance at trial. She cross-examined Piko regarding his prior forgery conviction, his probation status and his prior assault convictions. Piko admitted that he had made what could be interpreted as a threatening comment to [Petitioner] and that he had a temper (thus supporting [Petitioner's] self-defense theory), and that he thought he had a deal when he testified in the first trial (thus impeaching his credibility and establishing the basis for the motion that is the subject of section IV.G.1., [of the ICA's opinion]). Finally, the jury was unable to reach a verdict on the charges related to Piko, and the circuit court dismissed the charges after trial.
> Courts that have found no conflict of interest in former representation cases have emphasized that there was no adverse effect on the performance of counsel. . . .
> In sum, we conclude that the circuit court correctly analyzed [Petitioner's] motions under Rule 1.9, and did not abuse its discretion in denying the motions.

Mark, 120 Hawai'i at 535, 210 P.3d at 58 (emphases added) (citation omitted).

Although the observations made by the ICA are pertinent inasmuch as they reflect and support the conclusion that no conflict existed, they are misleading to the degree that they

indicate that a showing of an "adverse effect" or "actual prejudice" might be necessary, even where no consent has been given. Thus, it must be reiterated that <u>Richie</u> held that, at least where no consent has been given, no showing of adverse effect is necessary, and there is no requirement that prejudice be demonstrated under any circumstances.

E.

Underlying the question of whether a conflict existed is the question of whether OPD should be treated as a single law firm for purposes of this analysis, or as a government office. In that regard, HRPC Rule 1.10(a) provides in part that "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7[ or] 1.9[.]" However, with regard to government offices, HRPC Rule 1.10(d) provides for an exception that "[t]he disqualifications of Rules 1.7, 1.9(a), [or] 1.9(b) . . . shall not be imputed to government lawyers provided the disqualified government lawyer has been screened from participation in the matter."

> With respect to this question, the ICA stated that
>
> Rule 1.10(d) suggests the existence of a threshold question, i.e., whether the OPD should be considered a single law firm for the purposes of this analysis. <u>See</u> <u>State v. Pitt</u>, 77 Hawai'i 374, 380, 884 P.2d 1150, 1156 (App. 1994) (adopting a "case-by-case approach" to determine whether or not to apply the "private firm principle" of HRPC 1.10 to government offices). However, <u>in view of our application of Rules 1.7 and 1.9 to the circumstances of this case, we need not resolve that question, and we will assume arguendo that OPD was one "firm" within the meaning of HRPC Rule 1.10.</u>

<u>Mark</u>, 120 Hawai'i at 532, 210 P.3d at 55 (emphasis added). Thus,

81

the ICA did not directly address the Rule 1.10 question, because it determined that, under the circumstances of this case, the situation was not such that "one of them practicing alone would be prohibited from doing so by Rules 1.7 [or] 1.9[,]" see HRPC Rule 1.10, and thus, Rule 1.10 was not implicated.

However, as indicated before, Petitioner takes issue with the ICA's failure to "directly address[ Petitioner's] assertion that, if a public defender's office is to be treated as a private law firm rather than a government office, then there should be an imputed disqualification for all the attorneys in the office." Petitioner's contention apparently stems from his disagreement with the ICA's conclusion that no conflict existed, thereby making it irrelevant in this case whether Burks, Loy, and Marshall were part of one firm. But because there was no relationship giving rise to a conflict under the rules, it would make no difference whether Piko and Petitioner were represented by attorneys within the same firm, as opposed to a single attorney.

Petitioner's argument seems to be that OPD's status as a "single law firm" rendered its representation of Piko a matter of "concurrent" rather than "prior" representation, because his attorneys retained access to Piko's files. In that regard, Petitioner argues that

> [t]he OPD did not close and lock up Piko's case file. [Ho] testified that, within the OPD, there was "free sharing of information." There was no China Wall in place. There was no screening procedure to prevent [DPDs] from discussing client confidences with other [DPDs]. Attorneys were free

> to go to the file room and retrieve any file, even those that were closed.
>
> Piko's file was not closed forever and could be reopened at any time. The OPD more properly characterized it as "inactive," rather than "closed." Since Piko was still on probationary status, his case could be called up at any time -- as indeed it was.
>
> There was an inherent conflict of interest. The [DPDs'] duty to zealously represent [Petitioner] would have required them to dig for any impeachable evidence on Piko, including those in their own files. This also ties in with [OPD's] position that [it] should be treated as a single law firm. The fact that OPD supposedly did not discover this conflict until July of 2004 would indicate that [it] placed Piko's confidentiality above [Petitioner's] need for the evidence.

(Emphases added.)

Under Petitioner's formulation, because OPD should be treated as "a single law firm," due to, inter alia, the "free sharing of information" therein, no OPD attorney could ever subsequently represent a client having adverse interests to a former client albeit in an unrelated matter, because the former client's confidential information from the prior unrelated case might continue to be accessible.[40] However, such an analysis would render HRPC Rule 1.9 a nullity, inasmuch as, as discussed supra, the rule explicitly allows subsequent representation of a different client having interests adverse to a former client under certain circumstances, not only by the same law firm, but by the same attorney.

The same attorney will presumably always have access to the files and information regarding a former client, and HRPC

---

[40] Moreover, under Petitioner's view, subsequent representation would always be inappropriate, regardless of whether the matters were related, because the attorney would be obligated to use any information obtained in the prior representation to the subsequent client's advantage, regardless of the impact on the former client. Such an interpretation conflicts with Rule 1.9.

Rule 1.9 acknowledges as much, thereby prohibiting "[a] lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter [from] us[ing] information relating to the representation to the disadvantage of the former client . . . or reveal[ing] information relating to the representation[.]" HRPC Rule 1.9(c). As discussed above, the Commentary to Rule 1.9 addresses how the degree of "access" plays into a determination of whether confidentiality will be respected. As stated supra, the court's findings on this issue indicate that such access was limited in this particular case.[41]

Because the ICA's conclusion that no conflict was present in this case should be affirmed, the question of whether OPD acted as "a single firm" for purposes of this case need not be addressed. However, it should be noted that the ICA has previously concluded that such a determination should be made on a case-by-case basis. See Pitt, 77 Hawai'i at 380, 884 P.2d at 1156 ("We agree that the case-by-case approach should be used to analyze whether a defendant represented by a deputy public

---

[41] Although, technically, if OPD is considered a single law firm for purposes of this case, "access" would hypothetically be unfettered, inasmuch as all of the confidential information gained during Piko's representation would be imputed to Loy and Marshall. However, the question of access is still relevant, inasmuch as limited access ensures that the confidentiality aspect of Rule 1.9 will not be violated. Because Rule 1.9 does not absolutely prohibit a single attorney from subsequently representing a client whose interests are in some respect adverse to those of a former client, so long as the matters are not substantially related, and confidentiality is preserved, "access" alone cannot be the determinative factor, because a single attorney presumably always will have some sort of "access" to the information he or she obtained in the previous representation.

defender was denied his or her right to effective assistance of counsel because of a prejudicial conflict of interest on the part of his or her attorney.").[42] Pitt agreed with the approach set forth by the Court of Special Appeals of Maryland

> that under the case-by-case approach, if attorneys employed by a public defender are required to "practice their profession side by side, literally and figuratively," they are considered members of a "firm" for purposes of conflict of interest analysis regarding representation of multiple defendants, but where the practice of the attorneys in the office is so separated that the interchange of confidential information can be avoided or where it is possible to create such separation, the office is not equated with a firm and no inherent ethical bar would be present to the office's representation of antagonistic interests.

Id. at 380, 884 P.2d at 1156 (quoting Graves v. State, 619 A.2d 123, 133 (Md. Ct. Spec. App. 1993)) (emphasis added). The Pitt court determined that

> [u]nder this approach a trial court is required to conduct an evidentiary hearing to:
>       1. determine whether attorneys employed by the same public defender's office can be considered the same as private attorneys associated in the same law firm;
>       2. weigh factors relating to the protection of confidential information by considering whether there are separate offices, facilities and personnel; and
>       3. determine whether, as a consequence of having access to confidential information, [a deputy] public defender refrained from effectively representing a defendant.

Id. (quoting Graves, 619 A.2d at 134) (emphases added).

Consequently, it is worth observing that the court's findings relating to "factors relating to the protection of confidential information" seem to indicate that information from Piko's file

---

[42]    Any reference to a "prejudic[e]" requirement in Pitt has been overruled by Richie.

was not revealed at any point to Loy or Marshall.[43]  See id.

Although the Amicus brief relies heavily on Pitt, it should be noted that the third prong of the Pitt test, "whether, as a consequence of having access to confidential information, [a deputy] public defender refrained from effectively representing a defendant[,]" id., has been overruled by Richie.  As discussed previously, Richie held "that defense counsel's representation is constitutionally ineffective under the Hawai'i Constitution if: (1) a relationship giving rise to a conflict of interest existed between defense counsel and his/her clients; and (2) either the relationship adversely affected defense counsel's performance, or the client did not consent to the relationship." Richie, 88 Hawai'i at 44, 960 P.2d at 1252.  Richie only requires a conflict and a lack of consent as to the conflict.  Whether a DPD "refrained from effectively representing a defendant" because of possession of confidential information is no longer the determinative factor.

Furthermore, even if Pitt were controlling, OPD did not satisfy the third prong of the Pitt test.  OPD states that Loy had access to information contained in Piko's confidential file,

---

[43]    As to the first prong of the Pitt test, OPD declares that it weighs in favor of finding a conflict of interest in that the OPD was more akin to "private attorneys associated in the same law firm" than a government law firm.  (Citing Pitt, 77 Hawai'i at 380, 844 P.2d at 1156.)  However, as explained above, Pitt is no longer controlling law.  Furthermore, even if it were controlling, the ICA assumed, as does this opinion, that OPD is a private firm for the purposes of this analysis.  Mark, 120 Hawai'i at 532, 210 P.3d at 55.

but refrained from using it to impeach or cross examine him because of her duty to Piko. OPD asserts that this duty to refrain from using confidential information interfered with her duty to effectively represent Petitioner. However, nothing indicates that as a result of her being able to access information, she "refrained from effectively representing defendant." Pitt, 77 Hawai'i at 380, 884 P.2 at 1156. Respondent correctly asserts that Loy would have a duty to refrain from using confidential information to impeach Piko pursuant to HRPC Rule 1.9, regardless of whether such information was readily available. HRPC Rule 1.9(c)(1) expressly prohibits the "use [of] information relating to the [prior] representation to the disadvantage of the former client[.]" Thus, Loy was required to refrain from using confidential information, were she privy to any. The argument that her failure to use that information, an act prohibited by the HRPC, would result in divided loyalties between Petitioner and Piko, creates a conflict where none is present. As such, even under the Pitt test, OPD's argument is not persuasive.

F.

Although the foregoing analysis addresses most of the arguments raised in OPD's Amicus brief, OPD does make three other points in arguing that the ICA's decision adversely affected its interests. The first point is that "[i]f representation does officially end when the file has been closed [], deputy public

defenders will not only be relieved of its [sic] obligation to assist their clients[,] but will no longer have the legal authority to assist [p]robationers." In addressing OPD's assertion, Respondent notes, first, that the file is sealed and when a defendant is sentenced, "no further proceedings are scheduled[.]" Respondent states that nothing in the record alleges that Piko actually contacted the OPD after being resentenced or that other individuals do the same. Moreover, OPD provides no apparent explanation as to why the ICA's decision would prevent it from assisting probationers. Consequently, OPD's argument on this point is unpersuasive.

The second point is that the ICA's holding puts Loy "in an untenable position" inasmuch as her loyalties were divided while having to prepare for Petitioner's case, and at the same time upholding OPD's "ethical obligations to Piko." The ethical obligations OPD refers to involves refraining from using Piko's confidential information. OPD's basic assertion is that, by obeying the prohibition that Loy not use the confidential information in Piko's file against him, Loy demonstrated that her loyalties were divided between Petitioner and Piko and, thus, she was not able to adequately represent Petitioner.

As previously noted, HRPC Rule 1.9(c)(1) states that a lawyer shall not "use information relating to the [prior] representation to the disadvantage of the former client." The rules manifestly contemplate that there may arise instances in

which a lawyer has confidential information that was obtained through prior representation; and although the use of that information is prohibited, the rules do not categorically prohibit representation of a current client whose interests are adverse to those of the former client, provided it is not in the "same or a substantially related matter[.]" HRPC Rule 1.9(a). As Respondent explains, in the instant case, the DPD's "refusal to engage in unethical conduct or conduct prohibited by law does not place counsel in an unethical dilemma or a situation of 'divided loyalty.'" Thus, OPD's argument on this point is also unpersuasive.

OPD's final point that "distrust by the client will likely occur if the client is aware that the [DPD] or another [DPD] is representing or has represented the hostile party or witness" merits discussion. However, this contention is not sufficient to justify a per se rule disqualifying any DPD from serving as counsel in such cases.

There are two primary reasons why a per se rule imputing conflicts of interest to all lawyers working at the public defender's office must be rejected. The first advanced by some courts is that the same economic incentives that motivate private firms are not present at OPD. As one court stated,

> [p]ublic interest firms have no financial incentive in retaining the cases of joint defendants who might thereby be prejudiced. <u>As a consequence, the public does not lose confidence in a rule allowing attorneys in the same office to represent joint defendants, even though a single attorney from that office could not handle the cases.</u> Because the primary, if not the only, responsibility of an assistant

> public defender is to represent individual citizens in
> controversy with the State . . . we can expect the public
> defenders to withdraw from the case whenever joint
> representation may prejudice their clients.

State v. Cook, 171 P.3d 1282, 1291 (Idaho Ct. App. 2007) (citing

State v. Bell, 447 A.2d 525, 528 (N.J. 1982)) (internal quotation

marks omitted). Thus, the absence of a profit motive for

representation should restore, at least in part, confidence in a

DPD's ability to adequately represent a party.

The second reason is that a per se rule would result in

many defendants having to go without the expert representation

provided by public defenders. As the Illinois Supreme Court

noted:

> In many instances the application of such a per se rule
> would require the appointment of counsel with virtually no
> experience in the trial of criminal matters, thus raising,
> with justification, the question of competency of counsel.
> Balanced against this is the possibility, in most instances
> quite remote, that an experienced member of the public
> defender's staff might labor under a conflict of interest
> because another member of the staff was so burdened.

People v. Robinson, 402 N.E.2d 157, 162 (Ill. 1979). These two

considerations outweigh any possible chilling effect on attorney

client relationships at OPD. See also, Bolin v. State, 137 P.3d

136, 145 (Wyo. 2006) (stating that, although conflicts involving

associates at a private firm are imputed to entire firm, public

defenders office "warrants slightly different treatment[,]" and

adopting a case by case analysis); cf. People v. Daniels, 802 P.2d

906, 915 (Cal. 1990) (holding that public defender did not face

conflict requiring withdrawal when, bringing collateral attack of

a defendant's conviction, public defender was required to attack

competence of previous public defender, and stating that "automatic disqualification . . . would hamper the ability of public defenders' offices to represent indigents in criminal cases"); People v. Banks, 520 N.E.2d 617, 620 (Ill. 1987) (declining to "presume that public defenders would allow any office allegiances to interfere with their foremost obligation to their clients"). Hence, we decline to adopt a per se rule imposing disqualification on a DPD absent the development of an actual conflict.

VI.

A.

1.

In regard to his third question, Petitioner argues that "[t]he cumulative effect from all the pre-trial publicity combined with the jury taint and prosecutorial misconduct denied [Petitioner] of [sic] his right to a fair trial." Petitioner does not identify whether he was denied his right to a fair trial in his first trial, his second trial, or both. However, based on his reference to publicity, "jury taint" and "prosecutorial misconduct" noted above, it appears Petitioner is referring to his first trial.[44]

Petitioner asserts that (1) due to the fact that he was not convicted of murder in the first degree, "the prosecution

---

[44] These were arguments made by Petitioner in his Opening Brief regarding the deprivation of his right to a fair trial in his first trial.

failed to prove that [Petitioner] was aware that [Officer] Gaspar was a law enforcement officer[,]" therefore (2) "it was a scenario where [Petitioner] was being manhandled by three strangers[,]" making "self-defense [] clearly applicable[,] . . . yet[ (3) the jury] convicted [Petitioner] of murder in the second degree." According to Petitioner, "this was a result of the prejudicial pretrial publicity combined with jury taint and the prosecutor's improper inflammatory questions."

2.

Respondent argues that "Petitioner does not appear to challenge directly the ICA's assessment of each error as having no merit" and that "the fact that the ICA found no merit to any single error and affirmed Petitioner's convictions certainly suggests the [ICA] found no cumulative effect so prejudicial as to deny Petitioner a fair trial." Respondent presents no other arguments on this issue.

3.

In regard to Petitioner's first trial, the ICA held that because "the individual instances of error alleged by [Petitioner] are without merit, we need not address their alleged cumulative effect. Mark, 120 Hawai'i at 518, 210 P.3d at 41. As to pre-trial publicity, the ICA concluded that "the court's thorough voir dire of potential jurors," as well as "its repeated instructions to the jurors about avoiding exposure to media coverage and its questions to the jury confirming that they had not been exposed to

such coverage as the case progressed, adequately protected [Petitioner] from the potentially prejudicial effects of the extensive publicity that this case received." Id. at 520-21, 210 P.3d at 43-44.

Petitioner's allegation of "jury taint" involved an incident prior to voir dire where potential jurors had seen a sheriff standing "a couple of feet" behind Petitioner and, thus, could have inferred that he "was in custody and was accordingly dangerous." Id. at 521, 210 P.3d at 44. The ICA held that "[t]he court was able, through its voir dire, to identify and excuse those potential jurors who were affected by their observations." Id. Petitioner's claim regarding "prosecutorial misconduct" related to allegedly improper questioning of Petitioner and another witness by the prosecutor. The ICA concluded that the prosecutor "appeared to have a good faith basis for asking the challenged questions" and that "[a]lthough some of the questions could be interpreted as suggesting an improper inference, and the objections were sustained on that ground, those questions were ambiguous and thus did not prejudice [Petitioner], particularly given the court's prompt curative measures." Id. (internal citation omitted).

B.

Other than alleging that there was "prejudicial pre-trial publicity," "jury taint," and "prosecutorial misconduct," Petitioner does not identify any particular error committed by the

court. He points to no facts which would support such allegations, and makes no discernible argument in his Application related to why the pre-trial publicity was prejudicial, how the jury was tainted, or how the prosecutor committed misconduct. Indeed, Petitioner appears to concede that each of these alleged "error[s] standing alone may be harmless[.]" Therefore, any apparent claim by Petitioner that the alleged errors noted above occurred may be disregarded. See Norton v. Admin. Dir. of Court, 80 Hawai'i 197, 200, 908 P.2d 545, 548 (1995) (stating that the defendant "ma[de] no discernible argument in support of [his] position, . . . [and w]e may therefore disregard this particular contention") (citation omitted).

As noted above, Petitioner argues that "[i]n this case, the cumulative effect was clearly prejudicial" because "the prosecution failed to prove that [Petitioner] was aware that [Officer] Gaspar was a law enforcement officer," and "[i]f that was the case, then it was a scenario where he was being manhandled by three strangers[.]" According to Petitioner, "self-defense was clearly applicable[, a]nd yet, [the jury] convicted [Petitioner] of murder in the second degree[,]" which "was a result of" the alleged trial errors discussed above.

However, the fact that the jury convicted Petitioner of the lesser included offense of murder in the second degree of Officer Gaspar, rather than murder in the first degree, does not demonstrate that Petitioner was denied his right to a fair trial.

At trial, the court instructed the jury on the offense of murder in the first degree in regard to Officer Gaspar. In Jury Instruction No. 3, the court instructed the jury on the offense of murder in the second degree, which read as follows:

> if and only if you unanimously find the prosecution has not proven beyond a reasonable doubt all of the material elements of Murder in the First Degree, or you are not unanimous as to whether the prosecution has proven all of the material elements of Murder in the First Degree beyond a reasonable doubt, then you must consider whether the Defendant is guilty or not guilty of the included offense of Murder in the Second Degree.

The court then listed the material elements of the offense of murder in the second degree[45]:

> A person commits the offense of Murder on the Second Degree if he intentionally or knowingly causes the death of another person.
> There are two material elements of the offense of Murder in the Second Degree, each of which, the prosecution must prove beyond a reasonable doubt.
> These two elements are:
> 1. That, on or about the 4th day of March, 2003, in the City and County of Honolulu, State of Hawaii, [Petitioner] caused the death of [Gaspar]; and
> 2. That [Petitioner] did so intentionally or knowingly.

The court also instructed the jury on self-defense, stating that

> if you unanimously find that the prosecution has proven beyond a reasonable doubt all of the material elements of Murder in the First Degree, or of the included offense of Murder in the Second Degree, . . . then you must consider whether the force used by Defendant was justifiable based upon self-defense.

The court then explained the defense, and listed its elements:

> Justifiable use of force or deadly force based upon self-defense is a defense to the offenses of Murder in the First Degree, Murder in the Second Degree, and Manslaughter based upon reckless conduct. The burden is on the

---

[45] Although Petitioner objected to this instruction, apparently on the basis that it "fail[ed] to include justification[,]" Petitioner did not raise this instruction as a point of error on appeal, nor does he argue it was erroneous in his Application.

prosecution to prove beyond a reasonable doubt that the force used by [Petitioner] was not justifiable based upon self-defense. . . .

The use of force upon or toward another person is justified when a person reasonably believes that such force is immediately necessary to protect himself on the present occasion against the use of unlawful force by the other person. The reasonableness of [Petitioner's] belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in [Petitioner's] position under the circumstances of which [Petitioner] was aware or as [Petitioner] reasonably believed them to be.

The use of deadly force upon or toward another person is justified when a person using such force reasonably believes that deadly force is immediately necessary to protect himself in the present occasion against death, serious bodily injury, or kidnapping. The reasonableness of [Petitioner's] belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in [Petitioner's] position under the circumstances of which [Petitioner] was aware or as [Petitioner] reasonably believed them to be.

The use of force is not justifiable to resist an arrest which the actor knows is being made by a law enforcement officer, although the arrest is unlawful. On the other hand, if the law enforcement officer threatens to use or uses unlawful force, the law regarding use of protective force would apply.

The use of deadly force is not justifiable if [Petitioner], with the intent of causing death or serious bodily injury, provoked the use if force against himself in the same encounter, ir if [Petitioner] knows that he can avoid the necessity of using such force with complete safety by retreating or by complying with a demand that he abstain from any action which he has no duty to take.

If and only if you find that [Petitioner] was reckless in having a belief that he was justified in using self-protective force against another person, or that [Petitioner] was reckless in acquiring or failing to acquire any knowledge or belief which was material to the justifiability of his use of force against the other person, then the use of such self-protective force is unavailable as a defense to the offense of Manslaughter based upon reckless conduct.

Petitioner did not object to this instruction.

In sum, the jury was properly instructed that second degree murder was an included offense of first degree murder, and that even if the jury found that the prosecution had proved the elements of second degree murder beyond a reasonable doubt, the jury still needed to consider whether Petitioner was entitled to

the defense of self-defense. Based on the jury's verdict, the jury obviously found that the prosecution had satisfied its burden of proving the elements of the offense of murder in the second degree, and that Petitioner was not justified in using the force involved in that offense. Beyond bare allegations, Petitioner offers no explanation for why the jury's verdict "was a result of the prejudicial pretrial publicity combined with the jury taint and the prosecutor's improper inflammatory questions." Because (1) Petitioner has made no discernible argument in regard to any alleged errors committed by the court and (2) the jury was properly instructed on the offense of murder in the second degree and the defense of self-defense, Petitioner's claim that he was denied his right to a fair trial is not meritorious.

## VII.

### A.

Petitioner claims that "[i]f [his] case is remanded for resentencing it should be solely for non-extended term sentencing." According to Petitioner, "he should be treated just the same as [the defendant in State v. Maugaotega, 115 Hawai'i 432, 434, 168 P.3d 562, 564 (2007), whose case was remanded for only non-extended term sentencing." Petitioner contends that "[s]ince [his] case was pending appeal at the same time as Maugaotega, the same new rule should apply to all other 'similarly situated' defendants."

B.

Respondent argues that Petitioner "ignores" <u>State v. Jess</u>, 117 Hawai'i 381, 413, 184 P.3d 133, 165 (2008), which "is the controlling precedent the ICA was duty bound to follow." According to Respondent, pursuant to <u>Jess</u>, the ICA "correctly . . . determined that resentencing a criminal defendant under Act 1 is not unconstitutional and also authorizes a circuit court to resentence the defendant under a judicially reformed version of the prior statute governing extended term sentencing."

C.

The ICA discussed the relevant history of Hawaii's extended sentencing scheme as follows:

> After the decision in <u>Maugaotega</u>, the legislature amended HRS §§ 706-661, -662, and -664 to require that a jury, or the court if the defendant waives the right to a jury determination, find the facts necessary to impose an extended term of imprisonment beyond a reasonable doubt. 2007 Haw. Sess. L., 2d Spec. Sess., Act 1, § 2-4. Those amendments applied retroactively, <u>id.</u> at § 1, and provide that "[a] defendant whose extended term of imprisonment is set aside or invalidated shall be resentenced pursuant to this Act upon the request of the prosecutor[,]" <u>id.</u> at § 5; <u>see</u> [<u>Jess</u>, 117 Hawai'i at 413, 184 P.3d at 165] (determining that Act 1 is not unconstitutional).

<u>Mark</u>, 120 Hawai'i at 538-39, 210 P.3d at 61-62 (some brackets in original and some added). The ICA held that Petitioner's extended sentences, which were based on findings made by the court, rather than a jury, were "unconstitutional under <u>Maugaotega</u>." <u>Id.</u> at 539, 210 P.3d at 62. On remand, [Respondent] may request that [Petitioner] be resentenced to extended terms in accordance with Act 1, or may request the imposition of non-extended sentences." <u>Id.</u>

D.

As concluded by the ICA, and conceded by Respondent,
Petitioner's extended sentences violated his constitutional right
to trial by jury.  The ICA was correct to conclude that, pursuant
to the opinion of a majority of this court in Jess, on remand, the
court has the discretion to empanel a jury for purposes of
resentencing on the extended term sentence.[46]  In Jess, a majority
of this court determined that "[t]he circuit court would not
offend the right to due process by reforming HRS § 706-662 (Supp.
1996)[[47]] so as to allow for jury consideration of the necessity
finding and applying that reformation to the case at hand."  117
Hawai'i at 388, 184 P.3d at 140.  Jess recognized that,

---

[46]     Like Petitioner, "Jess' case was pending on appellate review at
the time Maugaotega [] was decided[.]"  Jess, 117 Hawai'i at 419, 184 P.3d at
171 (Acoba, J., dissenting).

[47]     At the time Jess was sentenced, HRS § 706-662 provided, in
relevant part, that

> [a] convicted defendant may be subject to an extended term
> of imprisonment under [HRS §] 706-661, if the convicted
> defendant satisfies one or more of the following criteria:
>     (1)   The defendant is a persistent offender whose
>           imprisonment for an extended term is necessary
>           for protection of the public.  The court shall
>           not make this finding unless the defendant has
>           previously been convicted of two felonies
>           committed at different times when the defendant
>           was eighteen years of age or older.
>     . . . .
>     (4)   The defendant is a multiple offender whose
>           criminal actions were so extensive that a
>           sentence of imprisonment for an extended term is
>           necessary for the protection of the public.  The
>           court shall not make this finding unless:
>           (a)   The defendant is being sentenced for two
>                 or more felonies or is already under
>                 sentence of imprisonment for felony[.]

Jess, 117 Hawai'i at 388, 184 P.3d at 140 (some bracketed material omitted).

> [i]n Maugaotega [], this court held that HRS § 706-662 (Supp. 1996) was, in light of Cunningham v. California, 549 U.S. 270, . . . (2007), unconstitutional on its face, insofar as every subsection "authorize[d] the sentencing court to extend a defendant's sentence beyond the 'standard term' authorized solely by the jury's verdict by requiring the sentencing court, rather than the trier of fact, to make an additional necessity finding that does not fall under Apprendi's prior-or-concurrent-convictions exception[.]" Maugaotega [], 115 Hawai'i at 446, 168 P.3d at 576 (footnote omitted).

Id. at 410, 184 P.3d at 162 (emphasis added) (ellipsis omitted).

However, in Jess, the majority went on to decide that the circuit court could apply a judicially amended version of HRS § 706-662, and thereby empanel a jury to resentence a defendant whose appeal was pending at the time of Maugaotega II, because

> [t]here has . . . been a recent seachange in the legislature's clearly expressed intent regarding the wisdom of employing juries in the context of extended term sentencing. The enactment of H.B. No. 2 . . . during the recent special session provides this court with a fresh, conclusive expression of legislative support for the use of juries as the trier of fact with respect to extended term sentencing fact-finding and allows us to conclude with confidence, that empaneling a jury would closely effectuate policy judgments clearly articulated by the legislature, and that the legislature would prefer such a reformed version of the statute to invalidation of the statute . . . . In light of the recent legislation, invocation of the court's inherent authority in the instant matter would not unduly burden or substantially interfere with the other branch's exercise of its power.

Id. at 412-13, 184 P.3d at 164-65 (quotation marks, citations, brackets, footnote, and ellipsis omitted) (emphasis added).

It was further determined that "[t]he circuit court may, with respect to a properly charged defendant, empanel a jury for determination of the necessary findings pursuant to the newly amended versions of HRS §§ 706-661, 706-662, and 706-664[,]" because "Act 1 of the 2007 Second Special Session . . . provides in relevant part that 'this Act shall apply to all sentencing or resentencing proceedings pending on or commenced after the

effective date of this Act, whether the offense was committed prior to, on, or after the effective date of this Act[,]'" and "that 'a defendant whose extended term of imprisonment is set aside or invalidated shall be resentenced pursuant to this Act upon request of the prosecutor.'" Id. at 413, 184 P.3d at 165 (brackets omitted).

Respondent is correct, then, that under Jess, upon remand, Respondent may move that Petitioner be sentenced to an extended term, either pursuant to a judicially amended version of the former version of the extended term sentencing statute under which he was previously sentenced, or pursuant to Act 1.

VIII.

For the foregoing reasons, the May 29, 2009 judgment of the ICA affirming Petitioner's convictions is affirmed, and his case is remanded for resentencing.

Dwight C.H. Lum for
  petitioner/defendant-
  appellant.

Donn R. Fudo, Deputy
  Prosecuting Attorney,
  City and County of
  Honolulu, for respondent/
  plaintiff-appellee.

On the brief:

James S. Tabe, Deputy
  Public Defender, for
  amicus curiae
  Office of the Public
  Defender.